Parker *et al.* *v.* The State, *ex rel.* Powell.

No. 16,731.

PARKER ET AL. *v.* THE STATE, EX REL. POWELL.

APPORTIONMENT.—*In Violation of the Constitution.—Judicial Jurisdiction of Act for.—Legislative Discretion.—A Political Question.*—The Legislature, in making an apportionment of the State for legislative purposes, has a certain degree of discretion which can not be interfered with; but when such act is in violation of the Constitution of the State, and the validity of the statute is called in question, the question is not merely political, but is a judicial one, and the courts have jurisdiction to pass upon it.

SAME.— *Legislative Discretion.—Equality of Representation. — Approximation to.— Unit of Representation.—Fractions of.*—The Legislature has no discretion to make an apportionment in violation of the enumeration of the inhabitants authorized to vote, as provided for in the Constitution; and, because exact equality is not possible, the General Assembly is not excused from making such an apportionment as will approximate the equality required by the Constitution; and this rule forbids the formation of districts containing large fractions unrepresented, where it is possible to avoid it, while other districts are largely over-represented. While the General Assembly has much discretion in disposing of the fractions of the unit of representation, yet it is not beyond control.

JURISDICTION.—*A Political Question.— What Constitutes Such a Question.— Courts Will not Take Cognizance of.*—Courts decline to take cognizance of political questions, which generally arise when there is an attempt made to prevent the incumbent of either the executive or legislative department of government from performing an act which such incumbent claims the right to perform by virtue of his office, or to compel him to perform some act which he declines or refuses to perform.

CONSTITUTION.—*Provisions of.— How Construed.*— Constitutional provisions are rarely, if ever, merely directory.

STATUTE CONSTRUED.—*Questions of Validity of.— When Considered.—Rules Governing.*—Courts are reluctant to declare acts of the Legislature unconstitutional, and, in passing upon such a question, are governed by the following rules: *first*, a court will never decide a question involving the constitutionality of a statute, if the merits of the case in which it is involved can be determined without such decision; and, *second*, a court will never declare a statute unconstitutional where there is any doubt upon the subject.

SAME.—*Apportionment Acts of 1891 and 1879.—Constitutionality of.*—The act of March 5, 1891, and the act of 1879, purporting to redistrict the State, for legislative purposes, are in conflict with the Constitution of the State, and therefore void.

Parker *et al. v.* The State, *ex rel.* Powell.

OFFICE AND OFFICER.—*Officer De Facto.*—*Validity of Acts of.*—Where one is elected to an office under an unconstitutional statute, he is an officer *de facto,* and his acts performed before ouster are as valid as the acts of an officer *de jure.*

RECOVERY.—*Theory of Complaint.*—*Relief Sought.*—*Not Entitled to.*—*Suit Must Fail.*—As the complaint proceeds upon the theory that representatives and senators should be elected under the act of 1879, and as that act has been held unconstitutional, the relief sought can not be granted, and the suit must fail. The court erred in overruling the demurrer to the complaint.

REHEARING.—*Petition for.*—*Waiver of.*—*Effect of Waiver.*—After an opinion has been rendered in a cause pending in this court, and all the parties to the appeal have joined in a waiver of the right to petition for a rehearing of the case, and accept as conclusive such opinion of the court, and the court has ordered the clerk of this court to certify the cause to the court below, such procedure divests this court of jurisdiction of both the cause and the parties.

SAME.—*Appearance of Attorney General as Amicus Curiæ.*—*Can not Petition for a Rehearing.*—Where a suit pending in this court is of such a character as to affect the entire people of the State so as to require the services of the Attorney General, and he is ordered by the court to appear in behalf of the people, he is not a party to the suit, and is, therefore, not entitled to petition for a rehearing, his relation being that of an *amicus curiæ.*

From the Henry Circuit Court.

*J. H. Mellett* and *A. G. Smith,* Attorney General, for appellants.

*A. W. Wishard, M. E. Forkner, F. Winter* and *J. B. Elam,* for appellee.

COFFEY, J.—This was an action by the State of Indiana, on the relation of Simon T. Powell, a legal voter of Henry county, against the appellants, Benjamin S. Parker, as clerk of the Circuit Court of that county, William Rinewalt, as sheriff, and Richmond Wisehart, as auditor, to compel them, by writ of mandamus, as such officers, to take the necessary steps to hold the election of 1892, for senators and representatives, under the act of the General Assembly for the apportionment of senators and representatives, approved March 8, 1879, and to enjoin them

from proceeding under the act of the General Assembly
for the apportionment of senators and representatives,
passed, notwithstanding the Governor's veto, March 5,
1891.

It is alleged that the appellants, as such officers, are
threatening, and are about to issue and give the necessary
notices and take the necessary steps to hold the election
of November 8, 1892, for senators and representatives, un-
der the apportionment made by the latter act, claiming
and asserting that the first named act was repealed by the
act of the General Assembly of the State for the appor-
tionment of senators and representatives, approved March
6, 1885.    It is alleged that the act of March 6, 1885, as
well as the act of March 5, 1891, is void, being in conflict
with the Constitution of the State.    The matters wherein
each of these acts are supposed to be in conflict with the
Constitution are fully and minutely set forth in the com-
plaint.    As to the act of March 5, 1891, it is alleged that
in the year 1889, the year prescribed by the Constitution
therefor, an enumeration of all the male inhabitants over
the age of twenty-one years, in the State, was taken under
the authority and by the direction of the General Assem-
bly, as required by the Constitution, which enumeration
showed the number of male inhabitants in each township
and county, as well as the total number in the State, over
twenty-one years of age.    The complaint then sets out the
enumeration by counties, showing the total number to be
551,048.    It is alleged that it was provided by the act of
March 5, 1891, that the General Assembly of the State
should consist of fifty senators and one hundred repre-
sentatives, and that it became the duty of the then sitting
General Assembly, under the Constitution of the State, to
apportion the number of senators and representatives to the
ensuing General Assembly, based upon the enumeration of
the year 1889, so that each senatorial district should con-
tain 11,020 male inhabitants above the age of twenty-one

years, as nearly as reasonably possible, and that each representative district should contain 5,510 male inhabitants above the age of twenty-one years, as nearly as reasonably possible. The complaint sets out the apportionment for senatorial and representative purposes, as fixed by the act of March 5, 1891, together with the number of male inhabitants over the age of twenty-one years in each district, as shown by the enumeration of 1889.

It is then alleged that, by this act, forty-three counties are formed into twenty-two districts, to each of which one senator is apportioned. Eleven of these districts, composed of twenty-three counties, contain, by the enumeration of 1889, 148,496 male inhabitants over the age of twenty-one years, while the other eleven of said districts, composed of twenty counties, contain only 99,609 such inhabitants. That no other senatorial representation is given by the act to any of the counties contained in the first mentioned eleven districts; and by such apportionment, the senatorial representation of 27,276 male inhabitants over twenty-one years of age, of said districts, being two senators, with a fraction over 5,236, is wrongfully denied to the counties contained in said districts and given to the counties contained in the other eleven, whereby their representation, which of right should be but nine senators, is increased to eleven, and the representation of the counties contained in the first mentioned eleven districts is reduced to eleven, when, of right, it should be thirteen; that the county of Brown, which, by the enumeration of 1889, contained only 2,332 male inhabitants over the age of twenty-one years, is placed in two senatorial districts, namely, one composed of the counties of Brown, Monroe and Bartholomew, and one composed of the counties of Brown, Morgan and Johnson, while the county of Clark, which, by the enumeration, contains only 7,304 male inhabitants over the age of twenty-one years, is also placed in two senatorial districts, namely, one composed of the counties of Clark, Scott and

Jennings, and one composed of the counties of Clark and Jefferson, whereby each of said counties of Brown and Clark is given senatorial representation greatly in excess of that to which they are entitled.

It is further alleged that, under the enumeration of 1889, Jay county was shown to have 5,823 male inhabitants over the age of twenty-one years, being 315 more than the representative unit, and that, by the act of March 5, 1891, it was denied a representative, and was united with the counties of Adams and Blackford for the election of one joint representative, such district having an excess over the unit of representation of 2,007, and with said county of Adams for the election of one other joint representative, such district having an excess over the unit of representation of 5,077; that by the act of March 5, 1891, sixty-one counties are formed into forty representative districts, to each of which one representative is apportioned. These districts, so far as composed of counties entitled to any representation therein, are made up of counties otherwise wholly unrepresented in the apportionment for representatives; and counties having an excess over the unit of representation, which excess is otherwise unrepresented, and is alone represented in said district. Twenty of said districts, composed of thirty-one counties, contain, as shown by the enumeration of 1889, 139,955 male inhabitants over the age of twenty-one years, who have no representation for representatives in the General Assembly under this act, except the twenty representatives apportioned to said districts; while the other twenty of said districts, composed of thirty counties, contained, as shown by the enumeration, only 85,764 such inhabitants otherwise unrepresented; by reason of which apportionment, 29,755 male inhabitants over the age of twenty-one years, in said first mentioned districts, who are entitled to five representatives, with a fraction over of 2,205 of the representative unit, are entirely deprived of such representation, and four of such

representatives are given, without right, to the second mentioned districts, whereby their representation is increased to twenty, when, of right, it should be only fifteen, and that of the first mentioned districts is reduced to twenty, when, of right, it should be twenty-five.

These several districts, and the counties of which they are composed, together with the number of male inhabitants in each, as shown by the enumeration of 1889, are set out in detail.　It is then alleged that included in the second mentioned districts are nine counties, each of which is given a separate representative, although each of said counties lacks more than 1,000 of possessing the unit of representation under the enumeration of 1889, while Jay county, with 315 in excess of such unit, is denied separate representation; that five counties are each given a separate representative independent of the districts above mentioned, while each of said counties lacks the unit of representation as follows : Tipton, lacking 1,125 ; Harrison, 613 ; Putnam, 17 ; Ripley, 637 ; and Franklin, 819, are each again represented in four of said mentioned twenty districts; said Tipton county, in the district composed of the counties of Clinton, Tipton and Madison; Harrison county, in the district composed of the counties of Floyd, Harrison and Crawford; Putnam county, in the district composed of the counties of Putnam, Clay and Montgomery, in which districts said counties respectively serve the purpose of making the other counties in said districts contiguous, which otherwise they would not be; and that said Ripley and Franklin counties are represented in the district composed of the counties of Ripley, Franklin and Union.

The complaint also contains allegations in relation to the act approved March 6, 1885, similar in character to those set out above, but in view of the conclusion we have reached in this case, we deem it unnecessary to set them out in this opinion.

Prayer for an alternative writ of mandamus requiring

the appellants to show cause why they should not proceed to hold the election for senators and representatives, at the election to be held on the 8th day of November, 1892, under the apportionment as fixed by the act of 1879, and that they be enjoined from proceeding under the act of 1891 or the act of 1885.

Upon this complaint the court issued the alternative writ, as prayed, to which writ the court overruled a demurrer interposed by the appellants, to which they excepted; and, failing and refusing to answer or plead further, a peremptory writ was ordered, and a decree entered enjoining the appellants from proceeding under either the act of 1885 or act of 1891, above referred to.

The only causes of demurrer which need be considered in this opinion are two, namely:

*First.* That the court has no jurisdiction of the subject-matter of the action.

*Second.* That the facts stated in the alternative writ of mandamus, and the complaint filed in the cause are not sufficient to constitute a cause of action.

It is not claimed that the Circuit Court has no jurisdiction to issue writs of mandamus and to grant injunctions in all proper cases, nor is it claimed that this suit is not properly brought by the State on the relation of Powell against the appellants; but the contention is that the suit involves a political question, over which the courts have no jurisdiction. If this contention can be sustained, that is the end of the controversy, for this court will not attempt an adjudication in a matter over which it has no jurisdiction.

A political question is one over which the courts decline to take cognizance, in view of the line of demarkation between the judicial branch of the government, on one hand, and the executive and legislative branches, on the other. American and English Encyclopædia of Law, title, "Political Questions."

Such questions most generally arise when there is an attempt made to prevent the incumbents of either the legislative or executive departments of the government from the performance of some act which such incumbent claims the right to perform by virtue of his office, or to compel him to perform some act which he declines or refuses to perform.

Many illustrations of the rules by which such questions are governed are to be found in the adjudicated cases, among which are the cases of *Mississippi* v. *Johnson, President,* 4 Wall. 475 ; *Georgia* v. *Stanton,* 6 Wall. 50, and *Marbury* v. *Madison,* 1 Cranch, 137, cited by the appellants.

In the latter case John Adams, as President of the United States, in the last days of his administration, appointed Marbury to an office, and caused his commission to be made out, signed, sealed and authenticated by the Secretary of State, but the same had not been delivered when the administration expired.    The new secretary, upon taking his office, refused to deliver the commission. Marbury thereupon applied to the Supreme Court of the United States for a mandamus to compel such delivery, and in argument it was contended, on behalf of the defendant, that the question presented was a political matter for the sole determination of the President and his secretary, and in no sense a judicial question.

It was declared by Chief Justice Marshall, in an elaborate opinion, covering the whole ground, that the case presented a judicial and not a political question.

The case of *Mississippi* v. *Johnson, supra,* was an effort on behalf of the State of Mississippi to enjoin Andrew Johnson, as President of the United States, and his officers and agents, appointed for the purpose, and especially E. O. C. Ord, assigned as military commander of the district of which that State constituted a part, from executing, or in any manner carrying out, two acts of Congress, known as

the reconstruction acts, upon the grounds that such acts were unconstitutional.

It was held that the bill tendered for that purpose presented a political question only, of which the court declined to assume jurisdiction, but the Chief Justice, in the course of the opinion delivered by him in the case, took occasion to remark that, " The Congress is the legislative department of the government; the President the executive department. Neither can be restrained in its action by the judicial department, though the acts of both, when performed, are, in proper cases, the subject of its cognizance."

The case of *Georgia* v. *Stanton, supra,* was an action on behalf of that State to enjoin Stanton, as Secretary of War, Grant, as general of the army, and Pope, Major-General, assigned to the third military district, consisting of the State of Georgia and other States, from carrying into effect the same acts of Congress involved in the case of Mississippi against Johnson and Ord. It was again held that the bill presented a political question only, of which the courts could not assume jurisdiction.

But in cases like the one now under consideration, where there is no effort to control, in any manner, the action of either of the other departments of the government, and where it is sought simply to determine the validity of an act of the legislative department, the decided weight of authority is, we think, to the effect that the question presented is not political but judicial, and that the courts have jurisdiction. This question has been so fully discussed and decided by the Supreme Court of Wisconsin, in the recent case of *State, ex rel. Lamb,* v. *Cunningham,* reported in vol. 53 N. W. Rep. 35, and in the case of *State, ex rel. Attorney General,* v. *Cunningham,* 51 N. W. Rep. 725, and in the case of *Giddings* v. *Blacker,* decided by the Supreme Court of Michigan, Albany Law Journal, September 3, 1892, vol. 46, p. 193, that it would seem unnecessary

to review it. It was determined in these several cases, which were all actions calling in question the validity of apportionment acts, that the question presented was a judicial question, of which the courts had jurisdiction; and such acts were adjudged by the courts to be invalid by reason of being in conflict with the Constitutions, under which the Legislature attempted to apportion the State for legislative purposes. In holding that the court had jurisdiction, the courts did nothing more than follow a long line of precedents to their logical results, as shown by the authorities cited in support of their opinions.

It has always been held by this court that it is its bounden duty, in all proper cases, to pass upon the validity of the acts of the General Assembly and to declare them void when in conflict with the Constitution of the State. Thus, as early as the case of *Rice* v. *State*, 7 Ind. 334, Justice Perkins said: "There are some propositions that may be regarded, we think, at this day, as being settled; * * * among them are these: that the Constitution of the State, relative to the acts of the Legislature, is the paramount or supreme law; that when the two conflict the acts of the Legislature must yield as utterly void; that it is the duty of the courts, in every case arising before them for decision, to decide and declare the law governing the case. * * * The duty of the courts to give construction to laws, and to declare void, or disregard because not laws, those legislative acts in conflict with the Constitution, grows, of necessity, out of this other duty of declaring what the law is."

To the same effect is *Campbell* v. *Dwiggins, Treas.*, 83 Ind. 473, and Cooley's Constitutional Limitations, 45.

It is conceded, however, by the appellants, as we understand them, that there might arise a case in which the courts would have jurisdiction to declare a law apportioning the State for legislative purposes void, as where the General Assembly should form districts of counties not

contiguous. If the courts have jurisdiction to declare an apportionment act void because it violates one provision of the Constitution we are unable to perceive why they have not such jurisdiction where it violates some other provision. The Constitution forbids the formation of senatorial or representative districts of counties not contiguous. It is conceded that an act which violates this provision would be declared void for that reason, and that the courts would have jurisdiction, in a proper case, to adjudicate the matter. If the General Assembly should district the State in such a manner as to apportion to the south half ninety representatives, and to the north half ten only, no one would doubt that this would be as plain a violation of the Constitution as where it forms districts of counties not contiguous. What good reason can be given for holding that the courts may take jurisdiction in the one case and denying such jurisdiction in the other? It will not do to say that the courts have no jurisdiction in the latter case, because the General Assembly has a discretion in the matter of districting the State, for it can not be successfully maintained that the incumbents of any department of the government have a discretion to disregard the Constitution of the State. We think if the courts have jurisdiction in the one case they also have it in the other. We do not mean by this to be understood as holding that the courts have the power to interfere in any matter confided to the discretion of either the legislative or executive department of the government. No court in the Union has maintained more vigorously than this the independence of the three several departments of the State government. *State, ex rel. Hovey,* v. *Noble,* 118 Ind. 350 ; *Hovey, Governor,* v. *State, ex rel.,* 127 Ind. 588.

But it is safe to say that when the acts of either of the three departments are in violation of the Constitution of the State, such acts are not within the discretion confided to that department. That the General Assembly has some

Parker *et al. v.* The State, *ex rel.* Powell.

discretion in the matter of districting the State for legislative purposes there can be no doubt, and there can be as little doubt that where it acts within this discretion the courts have no power to interfere. If it should be found, upon examination, that the several acts of the General Assembly, of which complaint is made in this action, are within the discretion confided to the legislative department of the State, that will be the end of this investigation; for we have no power, much less the inclination, to interfere with such discretion; nor are we able to perceive how such cases as that of *Smith* v. *Myers*, 109 Ind. 1, and *Hovey* v. *State, supra,* can affect the question now under consideration. If this were a case in which the appellee sought to compel the General Assembly to district the State in a particular manner, or even to act at all in any manner whatever, then this line of authorities would be applicable; and, by reason of the independence of the several departments of the State government, we would hold, without hesitation, that we had no jurisdiction over the matter. The courts have no power to district the State for legislative purposes. That duty belongs to another department. The most the courts can do is, in a proper case, to pass upon the validity of a law enacted for that purpose, and, if such law is found to be in conflict with the Constitution of the State, declare it invalid, leaving the Legislature free to enact one that does conform to the Constitution. This is quite a different thing, we think, from undertaking to control legislative action or discretion.

Our opinion is that the question presented by the record in this case is judicial and not political.

The case of *People, ex rel. Carter,* v. *Rice, Secretary of State,* recently decided by the Court of Appeals of the State of New York, reported in Albany Law Journal, October 22, 1892, vol. 46, p. 324, was an action brought to test the constitutionality of an act of the General Assembly

of that State, dividing it into districts for senatorial and representative purposes.

The court assumed that the questions presented were judicial, and not political, and proceeded to adjudicate upon the validity of the law. The conclusion at which we have arrived in this case is in accordance with all the authority to which our attention has been called, except the case of *Wise* v. *Bigger*, 79 Va. 269, in which the validity of an act of the General Assembly of that State, creating districts for representatives in Congress, was called in question. All that was said by the learned judge, who wrote the opinion in that case, at all pertinent to the question involved in this case, was that: "The laying off and defining the congressional districts is the exercise of a political and discretionary power of the Legislature, for which they are amenable to the people, whose representatives they are." This would be literally true in the absence of some constitutional provision requiring the districts to be formed in some particular manner. The opinion cites no authority to the rule thus announced, nor does the judge, who delivered it, give any argument in its support; but if it is to be construed as holding that all apportionment acts are but the exercise of a political or discretionary power, it is in conflict with the great weight of authority, and can not be followed.

We approach the other questions in the case with much reluctance, and with a full sense of their gravity. Courts always approach questions involving the validity of statutes reluctantly, and out of this reluctance has grown two well known rules: *first*, that the court will never decide a question involving the constitutionality of a statute, if the merits of the case in which it is involved can be determined without such decision; and, *second*, the court will never declare a statute unconstitutional where there is any doubt upon the subject. To doubt the validity of a statute is to resolve in favor of its constitutionality. *Warren* v. *Brit-*

*ton,* 84 Ind. 14; *Campbell* v. *Dwiggins, supra; Hays* v. *Tippy,* 91 Ind. 102.

The chief object of this suit is to secure a decision upon the question of the constitutionality of the several acts of the General Assembly, referred to in the complaint. The question is presented in the same manner as the question was presented in the case of *Giddings* v. *Blacker, supra,* and in the case of. *People, ex rel. Carter,* v. *Rice, Secretary of State, supra.* The case of *Giddings* v. *Blacker* was an action to enjoin the secretary of State, of the State of Michigan, from taking the necessary steps to hold an election for State senators, under an apportionment act approved in the year 1891, upon the ground that such act was unconstitutional, and to compel him, by *mandamus,* to proceed under an apportionment act approved in the year 1885. The case of *People, ex rel. Carter,* v. *Rice* was an action to enjoin the proper officers of the State of New York from proceeding to the election of senators and representatives, under an apportionment act approved in the year 1892, upon the ground that such apportionment act was unconstitutional, and to compel them, by *mandamus,* to proceed to such election under an apportionment act approved in the year 1879. In each of these cases, it seems not to have been doubted that the question of the validity of these several acts was presented in such a form as to require a decision upon that point. So, in this case, we are unable to perceive how the merits of the controversy are to be determined without a decision upon the question of the validity of the apportionment law of this State, passed in the year 1891. Should we reach the conclusion that this act is not unconstitutional, it will not be necessary to pass upon the validity of the other acts; but should we decide it invalid, then, in determining whether the appellee was entitled to the relief demanded, it would become necessary to pass upon the validity of the act of 1879; and if that is found valid, the question of the constitutionality of the act

of 1885 arises.   If the act of 1891 and the act of 1879 are
both unconstitutional, the appellee was not entitled to the
relief sought, and the question of the validity of the act
of 1885 is not involved in such a way as to require a de-
cision upon the question of its constitutionality.

Assuming, therefore, that the question is presented in
such a manner as to require a decision, we proceed to an
examination into the several provisions of what is known
as the apportionment act of 1891, and to a comparison of
such provisions with the sections of our State Constitution
with which it is claimed they conflict.   Before such com-
parison can be had, it is necessary to set out and analyze
the provisions of the Constitution upon the subject of ap-
portioning the State for legislative purposes.

Section 2, article 4, provides that "the senate shall not
exceed fifty nor the house of representatives one hundred
members; and that they shall be chosen by the electors of
the respective counties or districts into which the State
may, from time to time, be divided."

Section 4 of the same article provides that "the General
Assembly shall, at its second session after the adoption of
this Constitution, and every six years thereafter, cause an
enumeration to be made of all the male inhabitants over
the age of twenty-one years."

Section 5 provides that "the number of senators and repre-
sentatives shall, at the session next following each period
of making such enumeration, be fixed by law, and appor-
tioned among the several counties according to the number
of male inhabitants above twenty-one years of age in each :
*Provided,* That the first and second elections of members
of the General Assembly, under this Constitution, shall be
according to the apportionment last made by the General
Assembly before the adoption of this Constitution."

Section 6 provides that "A senatorial or representative
district, where more than one county shall constitute a dis-
trict, shall be composed of contiguous counties; and no

county, for senatorial apportionment, shall ever be divided." We think it was the intention of the Constitutional Convention to secure to the electors of the State, by the provision above referred to, an equal voice, as nearly as possible, in the selection of those who should make the laws by which they were to be governed. The General Assembly has no discretion, in our opinion, to make an apportionment in disregard of the enumeration provided for by the Constitution.

The enumeration required is not of the citizens generally, but of the inhabitants authorized to vote; and unless the General Assembly is to be governed by the enumeration, when made, in the matter of districting the State for legislative purposes, the enumeration is a useless ceremony, and an unnecessary expense. The purpose in requiring the enumeration is to fix the number of voters in each county, at the time the apportionment is made, in order that the Legislature may form districts so as to secure to each voter, as nearly as may be, an equal voice with every other voter in the State, in the selection of senators and representatives. The cardinal principle of free representative government, that the electors shall have equal weight in exercising the right of suffrage is recognized and secured. Representation according to population is the rule fixed by these several provisions of our Constitution, and the General Assembly has no more discretion, in our opinion, to disregard this rule than it has to disregard any other plain provision found in that instrument. The enumeration, at the short periods of six years, was intended to secure a readjustment and correction of the inequalities that might arise from the growth or shifting of the population within that period.

In argument, it seems to be agreed that it was the intention to provide that, in making an apportionment among the several counties for legislative purposes, the integ-

rity of the counties, when possible, should be preserved. This, we think, is true; and when that is done, it is plain that exact equality can not be secured. But, because exact equality is not possible, the General Assembly is not excused from making such an apportionment as will approximate that equality required by the organic law of the State.

A question somewhat similar to the one now under discussion arose in the Congress of the United States, in the year 1832, relative to the construction to be placed upon section 2, article 1, of the Constitution of the United States, which provides that, "representatives and direct taxes shall be apportioned among the several States which may be included within this Union, according to their respective numbers," etc. The committee, to whom was referred the question as to what was the constitutional method of apportioning unassigned representatives as between the States having fractions of population less than a full ratio, was of the unanimous opinion that the loss of members arising from the residuary numbers should be made by assigning as many additional members, as are necessary for that purpose, to the States having the largest fractional remainders.

Upon that occasion Mr. Webster said: "The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment of representatives among the several States, according to their respective numbers, as nearly as may be. That which can not be done perfectly must be done in a manner as near perfection as can be. If exactness can not, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule, merely because the rule of perfect justice can not be applied. In such a case approximation becomes a rule; it takes the place of the other

rule, which would be preferable, but which is found inapplicable, and becomes itself an obligation of binding force. The nearest approximation to exact truth, or exact right, when that exact truth or exact right can not be reached, prevails in other cases, not as a matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind; a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule." The rule recommended by this committee was subsequently adopted by Congress, so that representatives are now apportioned among the several States of the Union under it as a fixed and binding obligation.

The rule here announced is, we think, the true one. When it is found that exact equality can not be attained, where the integrity of the counties is preserved, approximation becomes a rule as binding upon the General Assembly as any other rule fixed by the Constitution.

It is said, however, that as to the fractions of the representative unit, the Constitution is silent, and that, therefore, the General Assembly has a discretion to provide for the representation of such fractions or to leave them unrepresented.

That is true in a limited sense only. The Constitution requires that the State shall be reapportioned every six years according to the male inhabitants over the age of twenty-one years in each county. It contemplates the formation of districts, each embracing as nearly as possible an equal number of the electors of the State. But the rule requiring an approximation to equality forbids the formation of districts containing large fractions unrepresented where it is possible to avoid it, while other districts are largely over-represented. That the General Assembly has much discretion in the disposition of the fractions of the unit of representation can not be doubted, but it is not a discretion beyond control. In so far as the Constitution

secures equality in representation, it is not silent as to the disposition of fractions, and the Legislature must dispose of them with a view of securing that end, otherwise an apportionment could be made which would give to one portion of the State nearly double the representation given to other portions. Constitutional provisions are seldom, if ever, to be construed as merely directory.

It may be that a General Assembly could make a valid apportionment, where none existed, at a time different from that fixed in the Constitution, for the reason, as held in the case of *People, ex rel. Carter,* v. *Rice, supra,* that there is a continuing obligation resting upon it to do so; but, however this may be, we have no doubt that our constitutional provisions relating to the manner of making an apportionment of the State for legislative purposes are mandatory. Cooley's Const. Lim. (6 ed.), 93.

With these constitutional rules constantly in mind, we proceed to test the act of the Legislature under immediate consideration by them, with a view of determining its constitutionality. It is alleged in the complaint, and admitted to be true by the demurrer, that under the apportionment for legislative purposes, as fixed by this act, forty-three counties of the State are formed in twenty-two districts, to each of which one senator is apportioned. Eleven of these districts, composed of twenty-three counties, contain, by the enumeration of 1889, 148,496 male inhabitants over the age of twenty-one years, while the other eleven, composed of twenty counties, contain only 99,609 such inhabitants.

It is thus shown that in a voting population of 248,105 there is a difference in favor of eleven districts, as against the other eleven named, of 48,887. We must take notice of the geography of the State, as well as of the enumeration of 1889, taken pursuant to law, and with such notice we doubt whether any one can be found so bold as to main-

tain that this apportionment approximates equality, or that equality can not be much more nearly attained.

It further appears that the counties of Brown and Clark are each contained in two separate senatorial districts. Brown county is in the senatorial district composed of the counties of Brown, Monroe and Bartholomew. It is also in the senatorial district composed of the counties of Brown, Morgan and Johnson. Clark county is in the senatorial district composed of the counties of Clark, Scott and Jennings. It is also in the senatorial district composed of the counties of Clark and Jefferson. The number of male inhabitants over the age of twenty-one years in Brown county, as shown by the enumeration of 1889, is only 2,332, while the number of such inhabitants in Clark county, as shown by the same enumeration, is only 7,304. The senatorial unit, or the number required to entitle a district to one senator, under this law, is 11,020. Brown county, under the apportionment as fixed by this law, with a voting population of 8,688 less than the senatorial unit, votes for two senators, while Clark county, with a voting population of 3,716 less than the unit, does the same thing. Many other counties in the State with four times the voting population contained in Brown county vote for one only. In our opinion, under the constitutional provisions above referred to, requiring equality in representation, no scheme for senatorial districts could be devised in which a county with a population no larger than that contained in Brown county could legally be entitled to vote for two senators. When a county of that size has been assigned to a senatorial district, and given a voice in the election of one senator it ceases, in our opinion, to be a factor in any legitimate scheme of apportionment for senatorial purposes. At the time our Constitution was framed, the convention had before it the history of the famous apportionment law of Massachusetts, passed on the 11th day of February, 1812, from which the word "gerrymander" orig-

inated.   It is fair to presume that they had learned of the evils resulting from such a law, and that "the death and burial of this monster, in the year 1814, was celebrated throughout the country in prose and verse."   By the provisions of our Constitution, prohibiting the division of counties in the formation of senatorial districts and requiring equality in representation, it is plain, we think, that the convention intended to put it beyond the power of the General Assembly to form districts upon the principle contained in the Massachusetts law.   The two senatorial districts of which Brown county forms a part are constructed upon the same principle as the apportionment law above mentioned, with the single exception that the integrity of counties is preserved.   If Brown county, with its small population, may be included in two senatorial districts, it may be included in four, and thus given a voice in the selection of four senators.   The same is true of Clark county.   With a large number of other counties in the State, containing a much larger population, restricted to a vote for one senator only, this can not be said to be equality.   The counties of Brown and Clark are entitled to an equal voice in the selection of senators, considering their population, with other counties in the State, and no more.   So much of the act as gives to each of these two counties a voice in two separate senatorial districts is, in our opinion, in plain violation of the provisions of our Constitution.

Under this law the unit for a representative is 5,510.   Jay county, as shown by the enumeration of 1889, has 5,823 male inhabitants over the age of twenty-one years.   It is denied a separate representative.   As we have seen, it is agreed, in argument, that the constitutional provisions, above set out, were intended to secure the integrity of the counties.   Jay county, having more than the representative unit, was, we think, entitled to a separate representative, and it was not within the power of the General Assembly

to deprive it of such representative. This would seem to be too plain for argument.

The three representative districts composed, respectively, of the counties of Clinton, Tipton and Madison, the counties of Floyd, Harrison and Crawford, and of the counties of Putnam, Clay and Montgomery, can not be sustained. Each of the counties of Tipton, Harrison and Putnam has less than the unit of representation, and each is given a separate representative. They were not entitled to further consideration or representation. The formation of these districts was an attempt to do indirectly that which could not be done directly, namely, form districts of counties not contiguous. By the same process, if it were permissible, the county of Marion can be made contiguous to the county of Vanderburgh, and that, too, notwithstanding every county intervening between the two is fully represented. Counties fully represented can not, in our opinion, be used for the purpose of joining counties which are not otherwise contiguous.

There are found in this act many other violations of the rule of equality in representation as fixed by the Constitution, especially in the formation of representative districts; but we deem it unnecessary to extend this opinion by setting them out. We have been asked to examine and compare the act now under consideration with other acts of the General Assembly, dividing the State into districts for legislative purposes, which we have cheerfully done. Such examination only serves to confirm a well known historical fact, and that is, that as each party succeeded to power in the State it endeavored to so district it for legislative purposes as to retain that power, and that, too, very often in total disregard of the Constitution of the State demanding equality in representation. The rule of practical construction is of no value when it is plain that the practice has been in open violation of the instrument which the court is called upon to construe.

Our conclusion is that the act of the General Assembly, passed on the 5th day of March, 1891, notwithstanding the Governor's veto, purporting to redistrict the State for legislative purposes, is in conflict with the Constitution of the State, and is for that reason void.

Nor do we apprehend that from this conclusion the disastrous consequences predicted in. argument will follow. The office of senator, as well as the office of representative, is not a statutory office, but an office created by the Constitution of the State.

It is true that the number is fixed by act of General Assembly, but this is true also of the circuit judges in the State. This fact does not change the nature of the office, and it is for this reason none the less a constitutional office.

It seems to be well settled that one who is elected or appointed to an office under an unconstitutional statute, before it is adjudged to be so, is an officer *de facto.* Throop Public Officers, sections 628–637; Mechem's Public Offices and Officers, section 318; *State* v. *Carroll,* 38 Conn. 449; *Brown* v. *O'Connell,* 36 Conn. 432; *Meagher* v. *Story County,* 5 Nev. 244; *Ex parte Strang,* 21 Ohio St. 610; *Commonwealth* v. *McCombs,* 56 Pa. St. 436; *State* v. *Bloom,* 17 Wis. 538; *Kirker* v. *City of Cincinnati,* 27 N. E. Rep. 898.

The rule that the acts of an officer *de facto,* performed before ouster, are, as to the public, as valid as the acts of an officer *de jure,* is too familiar to the profession to need the citation of authority. The public is not to suffer because those discharging the functions of an officer may have a defective title, or no title at all. *Case* v. *State,* 69 Ind. 46; *Blackman* v. *State,* 12 Ind. 556; *Bansemer* v. *Mace,* 18 Ind. 27; *Mowbray* v. *State,* 88 Ind. 324.

If, at the next ensuing election, the State is without a valid law creating senatorial and representative districts under the enumeration of 1889, the responsibility must rest with the Legislature and not with the judicial department of the State government.

The apportionment act of 1879 requires separate consideration, for the reasons that its provisions are, in many respects, quite different from the act of 1891. While it differs materially from the latter in many respects, an examination will disclose the fact that it disregards, unnecessarily, the principle of equality in representation required by our Constitution. It is subject to many of the constitutional objections urged against the act of 1891; but, as it is not at all likely there will ever be another effort to enforce it, no useful purpose would be subserved by setting them out in detail. It is sufficient to say that, in our opinion, the act of 1879 is void for the same reasons given as to the invalidity of the act of 1891.

The complaint, in this case, proceeds upon the theory that the appellee is entitled to have senators and representatives elected under the act of 1879. He must succeed upon this theory, if he succeeds at all. *First Nat. Bank* v. *Root,* 107 Ind. 224; *Western Union Tel. Co.* v. *Young,* 93 Ind. 118; *Chicago, etc., R. R. Co.* v. *Bills,* 104 Ind. 13.

The demurrer filed by the appellants necessarily calls in question his right to the relief sought. As the act of 1879 is unconstitutional, the appellee was not entitled to the relief he sought in this action, and for that reason the court erred, we think, in overruling the demurrer filed by the appellants.

This being true, the apportionment law of 1885 is not in question in such a manner as to require a decision as to whether it is valid or invalid. The court being able to decide the case upon its merits, without a consideration of the act of 1885, the rule that the courts will not consider a question of the constitutionality of a statute, except when it is necessary to a decision of the cause under consideration, applies, in this case, with all its force.

The apportionment law of 1885, under which the intervener, Chandler, was elected as a member of the State senate, not being involved in this suit, he has no personal

interest in this controversy. The adjudication in this case can in nowise affect his right to hold the office to which he was elected.

For the error of the court, in overruling the demurrer of the appellants to the alternative writ of mandate, the judgment of the Henry Circuit Court must be reversed.

Judgment reversed, with directions to the Circuit Court to sustain the demurrer of the appellants to the alternative writ of mandate.

Filed December 17, 1892.

## SEPARATE OPINION.

ELLIOTT, J.—In much of the reasoning of the principal opinion, I unreservedly concur, and to many of the propositions unqualifiedly assent; but, from so much of the opinion as proceeds upon the theory that questions as to the construction of the constitutional provisions relative to the apportionment of the State for legislative purposes, and as to the validity of the act of 1891, are properly before us, I am compelled to dissent. It is proper to say, at the outset, that I neither affirm nor deny the correctness of the construction placed upon the Constitution, nor do I either affirm or deny the validity of the conclusion that the act of 1891 violates the provisions of that instrument. I simply affirm that long settled principles forbid us from giving judgment upon such questions.

It is my purpose to state and develop, as briefly as the nature of the questions which I conceive are properly before us will permit, the reasons which control my judgment, using only such authorities as are near at hand, and not attempting to elaborate the propositions I state by extended argument or illustration:

I. The relator's complaint rests entirely upon the theory that the act of 1879 is valid, but, if he is right in the grounds upon which he assails the subsequent acts, that act

is as bad as any of the others, hence, he has no standing in court, as he himself makes evident; and when we have adjudged that he has no standing in court, we have decided all questions properly in the case, except jurisdictional ones, so that we can not properly or authoritatively give judgment upon the validity of subsequent legislative enactments.

The relator is involved in a fatal dilemma. If the acts of 1885 and 1891 are valid, he can have no relief; if they are void, so, also, is that of 1879; so that, whether the acts of 1885 and 1891 are valid or void, he can have no relief, and in either event he must utterly fail. The act of 1879 being void, according to the relator's own theory, he has, as he himself demonstrates, no fulcrum capable of supporting a lever for the overthrow of subsequent legislative enactments; and, hence, all that we can decide beyond jurisdictional questions, without transgressing settled principles, is that, by his own averments, his case is foundationless. Such a decision ends the case, and we can not, with propriety, consider other questions, except jurisdictional ones, and, certainly, not high and grave constitutional questions. If the system which the relator avers is in conflict with the Constitution, is to be smitten to its death by the courts, it must be at the suit of one who assails all the legislative acts founded on that system, for it can not be done at the suit of a party who demands that one of the acts resting on that system be upheld and the others destroyed. The relator is the actor, and is bound to make a case rendering it imperatively necessary to decide the constitutional questions he assumes to present; and he must succeed upon the strength of his own case, or fail, for he can not succeed upon the weakness of his adversary's. The act of 1879 is, according to his own theory, as full of evil as those he assaults, so that if one goes down so must all, and, with the fall of the act of 1879, ends the relator's case. It would be strange, indeed, if one of several acts

, resting upon the same system should be upheld and the others cast down; and stranger still, if that should be done where the one rescued from condemnation contains more of evil than those condemned. One who secures or demands a benefit under an unconstitutional act is estopped to assert its invalidity. *Daniels* v. *Tierney*, 102 U. S. 415. See, also, authorities collected in Elliott on Roads and Streets, note 2, p. 422. "Like reason doth make like law," and the reason of the cases referred to warrants the conclusion that the relator can not be heard to deny the validity of the acts of 1885 and 1891, while demanding relief upon an earlier act subject to the same objections as the acts he seeks to have overthrown. It can not be necessary to decide upon the validity of any of the acts, since all that is proper to do is to accept the relator's own theory, and to do this is to end the pending case.

II. Courts will not send against a public officer the extraordinary writ of injunction or of mandamus, unless the complainant makes it appear that the writ will be effective in the particular case in which it is demanded.

A writ issued in a case where it can not be effective goes forth without power and comes back unobeyed. Courts do not require parties to do fruitless acts, and they will not themselves do what they will not require of parties. A writ that will be unavailing will not be issued, since to issue it would be an idle ceremony. *Smith* v. *Myers*, 109 Ind. 1 (6). I fully concur in the conclusion contained in the very able opinion of my brother Coffey, that the relator is not entitled to the writ of mandamus because he himself adopts a theory which affirms that the legislative enactment on which he rests his complaint is void; but I think that when the conclusion that he is not entitled to the writ is reached, it follows as an inevitable sequence, that questions involved in the contention that the acts of 1885 and 1891 are void can not be considered or decided,

inasmuch as the decision of such questions is not necessary to a final disposition of the case.

III.   If the relator has a right to a decision upon the constitutionality of the act of 1891, and if that act be adjudged void, then it is necessary to determine what one of the apportionment acts enacted since the adoption of the present Constitution is valid, but the relator having placed his asserted right of action solely upon the act of 1879, and having, by his own theory, shown that act to be void, he has no right to demand that the court point out what act is valid, or declare under what act legislative elections shall be held.

The relator can not successfully give a protean character to his complaint and assert that if it is not good because founded on the act of 1879, it may, nevertheless, be good upon the ground that somewhere—where he does not say—in the long series of apportionment acts there is to be found an act authorizing an effective legislative election.   A complainant must construct his pleading on a definite theory, and on that theory it must state a cause of action or it will be incurably bad.   The complaint in this case is, as we all agree, bad upon the theory that the relator has a right to a writ coercing the election officers to proceed under the act of 1879, so that it is self-destructive; and, when this is adjudged, there is no necessity for considering questions affecting the validity of the acts of 1885 or 1891.   If, however, it be conceded that it is necessary to decide such questions and to adjudge either of those acts void, then it is indispensably necessary to designate a valid law, either in the statutes or the Constitution, under which legislators can be chosen, for it is inconceivable that no law exists providing for legislative elections.   If the hypothesis involved in the provisional concession be granted to be correct, and the court assumes to enter the field covering the acts of 1885 and 1891, it must, as a matter of judicial knowledge, take notice of all the statutes

upon the subject, and fix upon a valid one, if any such can be found, or else declare that no such act exists, and travel back to the apportionment made by our present Constitution; for it can hardly be possible that the court can enter the field containing the acts of 1885 and 1891, strike down the latter act, and yet not determine under what law legislators can be elected.   As well send men out upon an unknown sea without a compass as to adjudge the act of 1891 void, and yet not adjudge what law is valid; for without the designation of a valid act the electors and their officers would be entirely without guidance and utterly at a loss to know under what law to proceed.   It can not be reasonably expected that the electors or their officers can find such a law where the search of the highest court of the State proves unavailing.   But the concessions which require the hypothesis indicated, and lead to the consequences suggested, can not, as I am convinced, be made, for the relator, having singled out as the sole support of his case one act of the Legislature, has not the semblance of right to require the court to hunt for some other act and pronounce it valid.   There is neither principle nor precedent that will authorize, much less justify, us in entering the field in which lie the acts of 1885 and 1891.   It is evident that when it is adjudged, as it certainly must be, that the relator's own theory gives the death-blow to his asserted right of action, a final disposition of the case is made, and hence we can not without a direct violation of the well-known rule outlined in my fourth proposition consider any of the questions made upon the acts of 1885 or 1891.

IV.   The inexorable rule is that constitutional questions will never be decided unless their decision is indispensably necessary to a final disposition of the case actually before the court.

The general doctrine outlined in the proposition stated is asserted in the principal opinion, but the course of my

discussion requires its re-statement, although, as to the existence of the general principle, there is substantial harmony of opinion. I am, however, forced to the conclusion that the principle has not been given its necessary effect or just application. The principle is deeply rooted in the law, and has stood unchallenged by denial, and unshadowed by doubt, since the first authoritative declaration by the Supreme Court of the United States of the power and duty of the judiciary to give judgment upon the constitutionality of legislative enactments. Cooley's Const. Lim. (6th ed.) 196. This principle as firmly fetters the action of the court as does the Constitution the action of the Legislature. The principle is one which, for obvious reasons that have been often given, is to be implicitly obeyed, and to obey it in this case it is absolutely necessary to decline to consider questions involving the validity of the acts of 1885 and 1891, as well as questions respecting the construction of the provisions of the Constitution governing the subject of the apportionment of the State for legislative purposes. An incidental rule necessarily involved in this principle, and clearly resulting from it, is this: Constitutional questions will not be decided unless the party demanding their decision makes it evident that he has a right to require the court to decide them. To me it seems very clear that the relator has shown no such right. He falls far short, indeed, of showing such a right, for he has shown that there is no necessity for deciding the constitutional questions he professes to present, and showing, too, that his own standing is such that those questions can not be considered without violating fundamental principles.

V. The decision of the question involved in the contention that the court has no power to give judgment upon an act making an apportionment for legislative purposes is essential, inasmuch as the decision of that general question determines the right of the court to assume jurisdiction.

The court must meet and decide the general question stated, for if it has no right to assume jurisdiction, it can do nothing more than direct a dismissal of the suit, for it is established elementary law that where there is no jurisdiction of the general subject there can be no effective judgment beyond a mere direction to the trial court to dismiss the proceeding. *Robertson* v. *State, ex rel.,* 109 Ind. 79.

VI. The court has power to give judgment upon the constitutionality of an apportionment act where the question of its constitutionality is necessary to a decision of the case at its bar, and the question is presented by a party in a position to present it, and who does so present it as to make it the duty of the court to decide it.

The power to adjudge invalid such legislative acts as violate the provisions of the Constitution is an element of sovereignty, and is vested in the judiciary. It would be a surrender of a high constitutional power, that neither principle nor precedent will justify or excuse, to decline to give judgment upon the validity of an apportionment act when properly presented and necessary to a decision of a case brought to the bar of the court. Such a surrender would involve a breach of duty so flagrant that the most stinging rebuke would fall far short of an adequate condemnation of a court that would so grossly violate the trust imposed upon it by the Constitution. In a government of distributed powers, such as ours is, the power to adjudge acts void that conflict with the Constitution must necessarily reside elsewhere than in the law-making department, otherwise all governmental power would be unified and solidified in that department, and it would be the uncontrolled and absolute master and arbiter in all governmental affairs. If there be no such power in the judiciary, the Constitutions of the Nation and the State are, in their widest scope and minutest details, mere mockeries; but the power does reside in the judiciary, and it was placed there in the strongest terms by men who knew the

science of government in all its parts, and there it will remain as long as free government endures.   One of the first things a student of our system of government learns is that it is a system of checks and balances.   One of the principal checks upon legislative power is the authority of the courts to enforce obedience to the mandates of the Constitution by adjudging void enactments which conflict with its provisions.   History proves and experience demonstrates the necessity of such a check, for without it the legislative department arrogates to itself every substantial governmental function and power that it can grasp.  Reckoned as the lives of nations are reckoned, it is but a short time since Edmund Burke, in his splendid eulogy on the English governmental system, declared that there were three constitutional departments, forming, as he asid, "the triple cord, which no man could break: the solemn, sworn constitutional frank pledge of this Nation, the firm guarantees of each other's being and each other's rights, the joint and several securities each in its place and order." When Edmund Burke spoke of the system existing at the time he wrote he was right, but his forecast of the future was wrong, for man has broken the "triple cord," and the England of our day has only one department of government.   Parliament is supreme, and elsewhere there is not a spark of real power.   The officers of the kingdom, from the wearer of the crown down to the tipstaff, are mere servants and dependents of Parliament.   The change wrought by legislative usurpation and encroachment justifies the statement of Mr. Baghcot that "a legislative chamber is greedy and covetous; it acquires as much, it concedes as little as possible.   The passions of its members are its rulers; the law-making faculty, the most comprehensive of the imperial faculties, is its instrument.   It will take the administration if it can take it."   The English Constitution (Am. ed.) 95.   The great men who framed

our constitutional system knew and provided against the
dangers of legislative usurpation of power, and the wisest
among them united in devising checks upon it.   The
declarations of Madison and Washington are strong and
clear, and no reader of history can misunderstand their
meaning nor doubt their purpose.    Jefferson thus ex-
pressed his conviction :   " An elective despotism was not
the government we fought for, but one which should not
only be founded on free principles, but one in which the
powers of government should be so divided and balanced
among several bodies of magistracy as that no one should
transcend their legal limits without being effectually
checked and restrained by others."   To preserve these
checks, said a greater thinker than Jefferson, "must be
as necessary as to institute them."   [Washington's Fare-
well Address.]   The assertion of the power of the judiciary,
in the principal opinion, is not, as I believe, too strong; for
I do not doubt the power or the duty of the court to pre-
serve these checks by standing immovably against legisla-
tive encroachment, nor do I doubt that the duty is as clear
where apportionment acts are involved as in cases concern-
ing other acts.   To me it seems that the duty is, if possi-
ble, higher and sterner in such cases than in any others,
for if unconstitutional apportionment acts are conceded to
be beyond the domain of the judiciary, then the legisla-
tive power is absolutely unlimited and unfettered, and a
legislative body would be at full and unrestrained liberty
to enact measures perpetuating its own existence and aug-
menting its own power.    Constitutional limitations are
imposed to prevent unrestrained legislative action, and are
intended to guard against legislative usurpation.    They
operate upon all subjects of legislation, except subjects of
which the legislative department is expressly, or by clear
implication, given exclusive control.   Questions of a judi-
cial nature are in a very few instances made exclusively
legislative by the Constitution, and in such instances the

judiciary can not interfere with the legislative decision; but there is not the remotest suggestion in that instrument that the validity of an apportionment act is a question for the decision of the Legislature; on the contrary, the whole force of that instrument is directed against the assumption by the Legislature of authority over such a question.   An apportionment act which violates the provisions of the Constitution can no more become a law than can an unconstitutional act upon any other subject, nor has it any peculiar virtue or sanctity that lifts it above the power of the judiciary.   The Constitution is the touchstone for all legislative enactments, no matter what subject they may embrace or what object they may be intended to attain. An act that fails when brought to this universal touchstone must be condemned, whether it be an act providing for the election of legislators, or an, act providing for the election of petty township officers.   The Constitution makes no discrimination between classes of general legislative enactments, and until the people in the mode they have themselves prescribed change their Constitution, no earthly power can make such a discrimination, and place some general enactments within the domain of the judiciary and take others out of it.

In affirming, as I do, quite as fully and strongly as is done in the principal opinion, the power and duty of the court to entertain jurisdiction of questions affecting the validity of apportionment acts, when duly presented and absolutely necessary to a decision of the particular case, I do not, by any means, concede that such questions can be considered where they are not properly presented by a party having a right to present them; nor do I, by even the remotest implication, concede that such questions can be considered in a case that can be disposed of upon other grounds, for it is one thing to affirm that general jurisdiction exists, and quite another and radically different thing

to affirm that because jurisdiction of the general subject exists specific constitutional questions can be decided.

I concur in the conclusion that the judgment below must be reversed, but, as I have endeavored to show, the grounds upon which my opinion rests are in some respects different from those of the court.

Filed December 17, 1892.


### CONCURRING OPINION.

OLDS, J.—I concur in the principal opinion in this case. In my opinion it properly and legitimately expresses an opinion on the question of the constitutionality of the two acts of the Legislature, viz., the acts of 1879 and 1891. To decide the case it is absolutely necessary to determine the constitutionality of these acts, or at least one of them. While it is true the appellee must fail whether the acts are valid and constitutional or unconstitutional and void, yet to dispose of the case, the court must determine whether these acts are valid or void, and being compelled to determine the question as to their validity, the court should, in all fairness, express an opinion disclosing upon what theory the opinion rests; whether upon the grounds that the acts, or either one, or both of them, are valid or void.

Filed December 17, 1892.


### ON PETITION FOR A REHEARING.

HOWARD, J.—The attorney-general has filed a petition, which is supported by briefs, for the rehearing of this cause. His petition, as the chief law officer of the State, and because of the importance of the questions involved, is entitled to the gravest consideration.

A petition for a rehearing is a request to the court to revise its own action by correcting errors and modifying or

setting aside its judgment. The statute, section 662, R. S. 1881, provides that at any time within sixty days after the determination of a cause, either party may file a petition for a rehearing. The question, at the outset, therefore, is whether the attorney-general is himself a party to this action or whether he represents such party. Besides the special duties of the attorney-general provided for in various statutes, his general duties are named in sections 5659 and 5666, R. S. 1881. Section 5659 provides that "such attorney-general shall prosecute and defend all suits that may be instituted by or against the State of Indiana, the prosecuting or defending of which is not already provided for by law, whenever notified ten days of the pendency thereof by the clerk of the court in which such suits are pending, and whenever required by the governor or a majority of the officers of the State, in writing, to be furnished him within a reasonable time, for the purposes therein contemplated. And he shall prosecute and defend all criminal or State prosecutions that are now or hereafter may be pending in the Supreme Court of the State of Indiana."

This is not a suit by or against the State, although it is prosecuted by a relator in the name of the State; it is a suit for mandate, which is already provided for by law. Neither has the governor, nor a majority of the State officers, nor any clerk of a court, required or notified him to prosecute or defend in the case. Neither is it a case in which any criminal or State prosecution is pending in the Supreme Court. Section 5666 provides that "the attorney-general shall be required to attend to the interests of the State in all suits, actions, or claims in which the State is or may become interested in the Supreme Court, of this State." By this section he is made the law officer of the State in all matters before the Supreme Court in which the State has interests involved. This raises the question as to the interests of the State in this action, and particu-

larly as to whether she is a party to it. The interests of the State here concern the constitutionality of a law affecting the membership of the legislative department of the State government. We can hardly conceive of any suit before the court which would be of greater interest to the State, and it is eminently proper that the attorney-general should attend to those interests. This the court recognized in granting leave to the attorney-general to appear in the case in the order heretofore made, as follows:

"It further appearing to the court that the matters involved in said cause are such as affect the entire people of the State, and are of great importance, it is ordered that leave be granted to the attorney-general of the State to appear in behalf of the people and to take such steps as he may deem necessary to aid the court in reaching a just determination thereof."

This order of the court and the active participation of the attorney-general in the proceedings on appeal are in full harmony with the spirit of the statute. But did this appearance, or the order of the court, or the grave interests of the people in the case constitute the State a party? The order of the court could not make one a party who was not already a party in reality. It could only admit one to be a party who was already in fact and in law a necessary or a proper party to the suit. Could the important interests of the people make the State such a party? The people of the State are vitally interested in the decision of the constitutionality of every general law that comes before the court; but we should not, for this reason, say that the State should be a party to every suit that involved the constitutionality of a law of the State. It is the duty of the attorney-general to attend to the interests of the State when involved in a matter before the court. He comes there as an officer of the State to advise one of the three departments of the State government in such a manner "as he may deem necessary to aid the court in

reaching a just determination" of the matters that concern the interests of the State. The parties are already before the court, but, as we think, neither the State itself, nor the attorney-general as representing the State, is any more a party than if the matter were one to be decided by the executive or the legislative department of the government. Each department, in its own sphere, is the State, and, as such, guards the rights of the State, not as those of a stranger or mere suitor before it, but as those of the body politic, of which it is itself a part.

It can hardly be said that by reason of the decision rendered in the matters in controversy between the parties that the interests of the State and the people have not received due consideration. The attorney-general, as a sworn officer of the State, has done his duty as he saw it, and advised the court with great learning and ability. And it must be remembered, besides, that those constituting the court were themselves also sworn officers of the State, and, as a court, even constituted an integral part of the State government. Whether they decided the matters before them as the attorney-general thought right, or whether they decided them as the court as now constituted would have done, does not affect the question as to whether the decision so rendered can now be reviewed by the court in this case and as to the issues between the parties. We are of opinion that in such appearance the attorney-general is, in the strictest legal sense, a friend of the court, and not a party, nor the representative of any party to the suit before it. He has aided the court in its labors to reach a just decision of the case. That decision, whether right or wrong, has been reached, and his friendly office is ended. The parties have litigated the matters in issue between them, and have withdrawn, in so far as they can, from the jurisdiction of the court. We think he can not petition for a rehearing of the matters that have been tried and decided between them. Counsel for appellee, in one of

their briefs, call the attorney-general an intervenor in this case, but from what has been said of his office before the court he can not be an intervenor. As the law officer of the State, he has aided and advised the court even as he might have given his legal opinion to the governor when requested. But no judgment could be rendered for or against him, or for or against the State, as might be done in case of an intervenor.

But, although we do not think that the attorney-general can petition in this case as a party for a rehearing, yet we have no doubt that the case, like all others, is still before the court in case error or mistake has been made. The court may correct its own record, either on its own motion or on being advised of the mistake by any party in interest. In the case of *Board, etc., v. Brown,* 14 Ind. 191, a petition for a rehearing was filed more than sixty days after the decision. The court could not grant a rehearing, but it appearing that a decision had been rendered against one who had not been before the court, the court, on its own motion, granted a rule upon the other party to show cause why the decision should not be revoked. In *Taylor* v. *Elliott,* 52 Ind. 588, this court fully considered and decided its power to modify, correct, or set aside its own decision in a proper case. In *Crowell* v. *Jaqua,* reported in 15 N. E. Rep. 242, this court set aside one opinion, on account of an inadvertent error, and substituted another in its place. In Elliott's Appellate Procedure, section 550, the power of the court to correct its own errors is expressly maintained. Of this power there can be no doubt, but that is not the question before us. There is no mistake of fact, no inadvertence, "no errors into which the court may have fallen," but a deliberate decision of issues upon facts admitted by the parties. These parties have departed from the jurisdiction of the court, under the rules of the court as established in pursuance of the provisions

of the statute, and we do not think that the issues litigated between them can have a rehearing in this court.

The intervenor, Morgan Chandler, has also filed his petition for a rehearing of the cause, but he has filed no brief in its support, and, under the rules of the court, it can not, therefore, be considered. We are, besides, of the opinion that, as there was no decision adverse to him, he can not have anything upon which to base his petition for a rehearing.

It is, therefore, ordered and adjudged by the court that the petitions for a rehearing now on file in this cause be and the same are hereby rejected.

McCabe, J., dissents.

Filed January 27, 1893.

## Concurring Opinion on Petition for a Rehearing.

Coffey, C. J.—On the 3d day of January, 1893, a petition for a rehearing in this cause was filed on behalf of the attorney-general of the State. Before any consideration of such petition, we are met by the grave question as to whether we have any jurisdiction in the case. If we have jurisdiction, no great public inconvenience is likely to arise by reason of any action taken by the court in the cause; but, on the other hand, if we have no jurisdiction, any action we may take will be a mere nullity.

The granting of a rehearing under such circumstances would not annul the former adjudication holding the apportionment acts of 1879 and 1891 invalid. The evil consequences likely to follow upon the attempted enforcement of laws which stand authoritatively adjudged invalid can readily be foreseen. As to the manner in which or in what tribunal the question of the validity of such an attempt may arise, no one, at this time, can foretell; but that it would arise, in some form, in the event we should assume to act without jurisdiction, is reasonably certain. The

question of jurisdiction over the case necessarily arises upon the record.

Section 662, R. S. 1881, provides that "when any cause is determined in the Supreme Court, the clerk shall forthwith notify the clerk of the court below that it is determined, and whether reversed or affirmed, in whole or in part, or dismissed. At any time within sixty days after such determination, either party may file a petition for a rehearing; if not so filed, the decision and instructions of the Supreme Court shall be certified to the court below, unless otherwise ordered by the court."

Rule 38 of this court provides that "opinions and judgments shall not be certified to the court below by the clerk of this court, except in criminal cases, until the expiration of sixty days, unless by order of this court, or on the filing of waiver of petition for rehearing, which order of court, or filing of waiver, shall be certified by the clerk with the opinion."

The opinion of the court in this cause was filed on the 17th day of December, 1892, and on the 22d day of the same month the parties to this litigation, acting under the above statute and rule, filed in the clerk's office of this court the following waiver of the right to file a petition for a rehearing, viz.: "Come now the parties, both appellants and appellee, and each severally and separately waive and relinquish the right to file a petition for a rehearing of this cause, and accept as final and conclusive the opinion of the court heretofore rendered in this cause, and now ask that the court will order and direct the clerk of this court to immediately certify said cause and opinion to the clerk of the Henry Circuit Court, from which court the appeal in this cause was taken."

This waiver was signed by the attorneys of record for each of the parties, and was not only filed in the clerk's office, but the parties, in addition to such filing, procured an order of the court thereon, requiring the clerk of this

court to certify the cause according to this request and agreement of the parties.

The cause, pursuant to this agreement and waiver and the order of this court, was accordingly certified by the clerk of this court to the clerk of the Henry County Circuit Court.

That this was a legitimate mode of taking the case from this court seems not to be doubted, and that the cause, as well as the parties to the suit, is now beyond the power and control of this court, I think, is equally certain, unless some party remains here, not having joined in the waiver, who is entitled to file a petition for a rehearing.

No petition is filed by the State, and if such petition was on file it would be a sufficient answer to it to say that it was not entitled to a rehearing without the consent of the relator to whom it has extended the use of its name for the enforcement of a private right, even if it had not joined in the waiver, which it has done.

A petition has been filed by Mr. Chandler, an intervenor, but it is not claimed that he is entitled to a rehearing. If such claim were made it would be a sufficient answer to it to say that he has not filed a brief in support of his petition, and for this reason, under the well-known rules of this court, it is waived.

The only petition in the cause under which it is claimed we have the power to grant a rehearing is filed by the attorney-general of the State.

During the progress of the cause in this court the following order was made, namely: "It further appearing to the court that the matters involved in said cause are such as affect the entire people of the State, and are of great importance, it is ordered that leave be granted to the attorney general of the State to appear in behalf of the people and to take such steps as he may deem necessary *to aid the court* in reaching a just determination thereof."

It is now claimed by the attorney general that by virtue

of this order he became a party to this suit. Unless this claim can be maintained, of course, his position is not entitled to consideration; for, as will be seen by reading the statute, no provision is made for filing a petition for a rehearing by any person other than a party.

The contention that the attorney-general is a party to this suit would seem to be so destitute of plausibility as not to require a moment's consideration, were it not for the apparent earnestness with which he seeks to maintain it.

In the *nisi prius* courts parties are known as plaintiffs and defendants. In this court they are known as appellants and appellees. If the attorney-general is a party to this suit, which is he, an appellant or an appellee? With whom is he litigating? What judgment shall be rendered either for or against him? He is not an intervenor, for no person can be such unless he has a personal interest in the controversy, and it will certainly not be contended that the above order embraces a right to set up a personal interest.

It was perfectly proper, I think, for the court, in view of the public interest involved in this case, to invite the attorney-general, the chief law officer of the State, to aid it, with his extensive knowledge of the law, in arriving at a correct conclusion; not in private consultation, but in open argument and by briefs. As he was the representative of the whole people of the State, the court had the right to assume that he would stand impartial as between the parties, and that he would honestly and faithfully, as a public officer, give to the court his views upon the new and intricate questions involved. That he did, by the able brief filed by him, give the court much aid is not to be denied. But it was not as a party to the suit that he was permitted to file briefs and argue the case. His relation to the court was simply that of an *amicus curiæ*. It is not the function of an *amicus curiæ* to take upon himself the management of a cause. Anderson's Dictionary of Law,

title *Amicus Curiæ.* The powers and duties of an *amicus curiæ* are well understood by the profession. In the case of *Irwin* v. *Armuth*, 129 Ind. 340, it was said: "An *amicus curiæ* may appear, and, with the permission of the court, introduce evidence for his own benefit, but he can not except to any ruling made by the court, as he has no right to complain if the court refuses to accept his suggestions."

This cause was certified to the Henry Circuit Court on the 22d day of December last. It may be that the judgment has been rendered by that court in accordance with the opinion and directions of this court. If so, can we now, by any action we may take, affect that judgment? I think not. In my opinion, the moment this cause was certified to the Henry Circuit Court by order of this court, we lost jurisdiction over it as fully as we would have lost it had the sixty days allowed to file petitions for a rehearing fully expired.

For these reasons, I am of the opinion that we have no jurisdiction and that we have no power to consider the petition for a rehearing filed by the attorney-general.

