VERNON THOMAS BLUITT, JOHN MARSHALL WHITFIELD, EDGAR LAMAR SCOTT v. STATE OF INDIANA.

[No. 1277S809. Filed October 13, 1978.]

*Arnold Paul Baratz,* of Indianapolis, for appellants.

*Theodore L. Sendak,* Attorney General, *Michael Gene Worden,* Deputy Attorney General, for appellee.

HUNTER, J.—Vernon Bluitt, John Whitfield, and Edgar Scott were jointly tried after an incident in which a federal drug enforcement agent was robbed and shot. Each defendant was found guilty of armed robbery; each defendant was sentenced to twelve years' imprisonment. In their joint appeal to this Court, three issues are presented:

1. Did the trial court err in overruling the defendants' motion to suppress their confessions?

2. Did the trial court err in denying the defendants' motions for separate trials?

3. Did the trial court err in denying the defendants' motions for a mistrial?

Michael Jackson testified that three young men accosted him in the parking lot of the Quality Inn near the Indiana State Fairgrounds, Indianapolis, Indiana, on August 17, 1976. Two Indianapolis Police Department officers were to have met Jackson at the motel, and they witnessed the final episode of the robbery. The three armed youths had taken Jackson's wallet, watch, and service revolver. Then, as the youths began to leave, with Jackson standing with his hands in the air, they repeatedly shot Jackson. Jackson stated, "[F]or no apparent reason they turned and started firing." The police estimated that as many as ten shots were directed at Jackson. Jackson was hit twice in the groin and once in the hand; he had to crawl under a pick-up truck for cover. The officers were able to identify positively a Jeffrey Wilson as one of the attackers; he was tried separately. Although no positive eye-witness identification was made on the others, investigation revealed that Bluitt and Scott were at the robbery scene, and Whitfield was waiting in an automobile close by.

## I.

Between August 17, 1976, and August 25, 1976, the Federal Bureau of Investigation (FBI) and the Indianapolis Police Department conducted an investigation of the attack on Jackson. On August 25, 1976, three teams of investigators from the FBI separately interrogated Bluitt, Whitfield, and Scott. Each team went to one of the three defendants' homes; each defendant was questioned in the presence of a parent.

Each defendant now raises as error the refusal of the trial court to suppress the statements obtained. The defendants

argue that since they were juveniles at the time they were questioned they should have been provided time to meaningfully consult with their parents before statements were taken. They maintain that the failure of the law enforcement officials to provide such meaningful consultation time renders their confessions involuntary and inadmissible. To support their allegations, the defendants cite our decision in *Hall* v. *State*, (1976) 264 Ind. 448, 346 N.E.2d 584. The defendants insist that "a meaningful consultation can only occur in the absence of the neutralizing pressures which result from police presence, . . ." and that since the record here demonstrates that the defendants were never left alone with their parents before the statements were taken, the statements were not voluntarily given. We disagree.

Before we analyze the factual posture of the defendants' confessions and waivers, it is important that we briefly review those Indiana decisions which address the special problems inherent within confessions obtained from juveniles. The minimum standards for procuring a valid waiver from a juvenile were set forth in *Lewis* v. *State*, (1972) 259 Ind. 431, 288 N.E.2d 138:

> "[A] juvenile's statement or confession cannot be used against him at a subsequent trial or hearing unless both he and his parents or guardian were informed of his rights to an attorney, and to remain silent. Furthermore, the child must be given an opportunity to consult with his parents, guardian or an attorney representing the juvenile as to whether or not he wishes to waive those rights. After such consultation the child may waive his rights if he so chooses provided of course that there are no elements of coercion, force or inducement present." 259 Ind. 431, 439, 288 N.E. 2d 138, 142.

In *Bridges* v. *State*, (1973) 260 Ind. 651, 299 N.E.2d 616, we added that before a confession may be deemed admissible a judge must inquire of the juvenile and his parents whether the waiver is voluntarily, knowingly, and intelligently given. We held that "[s]uch an inquiry would be meaningless unless the judge established that the juvenile and his parents, if

available, knew what his rights were." 260 Ind. 651, 654, 299 N.E.2d 616, 618.

As we stated in a footnote in *Hall* v. *State, supra,* the holding in *Lewis* v. *State, supra,* was fashioned to provide a special measure of care for juveniles prior to their ██ waiving of the important constitutional rights which must be disclosed to them under *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. In further defining this "special measure of care," we did make the statement that an opportunity to consult with a parent *prior* to the execution of the waiver is meaningful only in the absence of the neutralizing pressures which result from police presence. There is, therefore, a factual determination to be made in all cases of juvenile confessions: (1) were there neutralizing pressures which rendered the confession involuntary, and (2) did those neutralizing pressures result from police presence? In order to make this factual determination, the trial court is bound to examine the totality of the circumstances. As we have stated in *Burnett* v. *State,* (1978) 268 Ind. 618, 377 N.E.2d 1340:

> "In juvenile confession cases, we should only look to the record to determine if there was a meaningful opportunity for full consultation between the juvenile and his parent or guardian, *without any coercion on the part of the police.* . . ." 377 N.E.2d 1340, 1342-1343 [emphasis added].

We note that the totality of the circumstances in the *Hall* decision amply demonstrates that the juvenile was not afforded any *special* measure of protection, but rather was denied the protections which should be afforded to *any* defendant: he was not advised of any rights other than to have a parent or guardian present prior to questioning; by the time the defendant's guardian arrived, the juvenile had *already* been subjected to overzealous police activities, and therefore there *could be no* meaningful consultation on whether the defendant should waive the rights. *Contra, Tippitt* v. *State,* (1977) 266 Ind. 517, 364 N.E.2d 763.

The fundamental fairness of the arresting officers and the overriding atmosphere of respect within the interrogation process are crucial indices to our examination of the totality of the circumstances surrounding the juvenile's confession. Where there is no evidence of pressure, *and* there is evidence of no pressure, the confession is admissible as voluntary.

At the hearing on the motion to suppress, certain evidence was adduced. Scott was seventeen years, eleven months old when he was arrested. FBI officers initially contacted Scott at his home. Scott was placed in an FBI car and was advised of his rights. He was specifically told that since he was seventeen, the officers did not want to talk to him at all until one of his parents was present. Even though Scott indicated a desire, on the ride to the FBI office, to talk about the issue, he was told to wait until his parents got there. Scott was taken to an interview room at the FBI office. The officers brought Scott cigarettes and coffee and continued their efforts to locate his father. When Scott's father arrived, he was told the reason why Scott was being held, and he was told that the officers could not talk to Scott without the father's presence. Then, in front of both Scott and his father, the FBI officials explained the charges and the possible penalty. Scott's rights were explained orally; Scott and his father were given a rights form which they both read, stated they understood, and signed.

Scott's father had indicated in the hallway that he wished Scott would hurry up and turn eighteen so he would no longer have to come down when Scott was locked up. Scott and his father did speak to each other during the interrogation. Scott had completed the eleventh grade in high school and could read, write, and understand the English language. After the rights waiver was signed, Scott's father told Scott to "get it straightened out, . . . tell the truth. . . ." Neither Scott nor his father requested an opportunity to speak alone at the FBI office, and they were not left alone for

that purpose. The FBI officer did testify that had the Scotts made such a request, it would have been permitted. The interview was characterized by a spirit of cooperation, according to the FBI officer. Scott's father himself testified that the FBI agents were very courteous during the interview. We find from the totality of the circumstances that Scott's confession was knowingly and voluntarily given, and it was properly admitted at trial.

The second defendant, John Whitfield, was seventeen years and two months old when he was arrested. The FBI agent testifying regarding Whitfield's arrest claimed that he went to Whitfield's home at 7:34 a.m. on the morning of August 25, 1976. Whitfield's mother answered the door. The agents were led to a bedroom where Whitfield was sleeping. The agents identified themselves and told Whitfield to get out of bed. They took Whitfield to the other room and sat on the couch. No conversation between the agents and Whitfield took place during this initial confrontation. Other agents arrived, and they explained to Whitfield who they were and why they were there; he was advised of his rights, first orally and then he read the form himself and read it back to the agents. Whitfield indicated that he understood his rights because he had heard them before. Whitfield declined to sign the waiver form. The rights were explained again to Whitfield's mother, who was sitting in the room at the time. She indicated that she did understand the rights, and she said that she would sign the form. The agents then interviewed Whitfield, and within an hour after they had first arrived, Whitfield stated that he was driving the car on the night of the robbery and shooting.

Whitfield and his mother were never left alone at the apartment house. At the beginning of the interview, after a few questions, Mrs. Whitfield was asked if she would like to talk with her son. She stated no, "I just want him to tell the truth, . . ." There was no response from Whitfield. Whit-

field, his mother, and the FBI agents went to the FBI office to continue the interview. The agents got coffee for Whitfield and his mother. The confession was transcribed and typed, Whitfield reread it, and he initialed corrections and the beginning and ending of every page. Whitfield and his mother signed the statements. Whitfield had completed the eleventh grade in high school, could read and write, and could understand the English language. Again, the totality of the circumstances demonstrates that Whitfield was not coerced by the investigating officers. His confession was properly admitted into evidence.

When investigators reached the home of Vernon Bluitt, the third defendant, he was sleeping. In the same room with him was Jeffrey Wilson. They were told to get up and come downstairs; the agents identified themselves and explained why they were there. Bluitt's father came in, and the agents explained to him that they were investigating the shooting of the drug enforcement agent. (Jeffrey Wilson had been taken to another room.) Before any specific questioning began, Bluitt was advised of his rights, both he and his father read the rights form, and they signed the form. Each indicated that he understood the waiver document. The agents then interviewed Bluitt who refused to answer questions regarding the shooting, in effect denying participation. The agents indicated that they would like to take Bluitt to the FBI office to continue questioning, and Bluitt agreed to go. Bluitt's father, however, stated that he could not accompany Bluitt at that time. Sometime after Bluitt was taken to an interview room at the FBI office, Bluitt indicated that he intended to tell the agents what happened. He gave the agents "a thumbnail sketch" of what happened. The FBI agents then contacted Bluitt's father, asking him to come to the office. When he arrived at the office, Bluitt was again advised of his rights in the presence of his father, a statement was taken, it was typed, Bluitt corrected it, and it was signed.

Bluitt argues that because he had indicated some of his involvement to the FBI officials before his father arrived, his later formal confession was not voluntary. The record indicates that Bluitt was at the FBI office approximately two hours before his father arrived. The agents got him a coke; they talked to him generally about the crime. Bluitt's father had been invited to accompany Bluitt and the agents to the FBI office, but he had been too busy. When it became obvious to the agents that Bluitt was going to make a detailed statement, they called Bluitt's father not once but twice. After they finally contacted him, it was about an hour before he arrived even though the office was only a fifteen to twenty minute drive from the Bluitt residence. During the period that Bluitt's father was enroute, all interrogation was discontinued.

Bluitt was seventeen years and eight months old when he was arrested. At the initial questioning in the Bluitt home, Bluitt's father had indicated some frustration with his son's problem because he had plans to paint his house that day; he generally implied that he wanted Bluitt to tell the investigators what they wanted to know. He testified that he had been through the arrest procedure before with his son on other criminal charges. He stated that he understood that he had a right to advise his son not to say anything. He testified that all of the agents were very courteous, polite, and there was no pressure in any way. Once again, the totality of the circumstances indicates no evidence of pressure, and evidence of no pressure. The statement obtained from Bluitt was properly admissible. The trial court did not err in overruling the defendants' motions to suppress.

Lest there be any misunderstanding on the part of the defendants, we deem it necessary to address two particular factual allegations regarding the procedures utilized by the FBI in this criminal investigation. First, it is undisputed that in each arrest situation the agents entered the defend-

ant's residence with guns visible. It is also undisputed that as soon as the defendants were searched the guns were no longer prominent in the discussions. In light of the fact that the FBI agents were investigating the shooting of a federal drug enforcement agent, we hardly believe that the cautious procedure was undue. Had a less wary approach been used, the officers would have been negligent of their own safety. The presence of guns at the scene of the arrest does not constitute evidence of coercion.

Second, the evidence is uncontradicted that even if the defendants or their parents had requested an opportunity to speak alone in the homes at the times of the arrests, they would have been denied that opportunity. Again, this procedure makes sense. What good investigating officer would confront a suspect and then allow the suspect and his parent to confer out of sight and possibly effect an escape? The record does clearly indicate that FBI procedure mandated parental presence during questioning, the advising of both the juvenile and his parent of constitutional rights, and no coercion. These same safeguards have been required by this Court since *Lewis* v. *State, supra. Even though it provides a clearer record on appeal when the juvenile and his parent have been afforded the opportunity to counsel alone, the absence of this opportunity per se does not automatically render a confession inadmissible. Where, as here, the overriding atmosphere of the interrogation process indicates a fundamental fairness, and the totality of the circumstances demonstrates that there was no coercion, the confession should be admitted.*

## II.

The defendants' contention that the trial court erred in denying them separate trials is without merit. First, had the trial court erred, the error would have been harmless since inculpatory statements of each defendant were properly admitted. See *Carter* v. *State,* (1977)

266 Ind. 140, 361 N.E.2d 145, 149. Second, no prejudice has been shown; the defendants have not demonstrated that the trial court abused its discretion. *See Ortiz* v. *State,* (1976) 265 Ind. 549, 561, 356 N.E.2d 1188, 1195. The granting of a motion for separate trials is within the discretion of the trial court, and demonstration of prejudice to the defendant must be shown. *White* v. *State,* (1975) 263 Ind. 302, 330 N.E.2d 84.

Statutory guidelines regarding the use of statements of co-defendants were followed. All references to co-defendants were totally and effectively deleted from each defendant's statement. Ind. Code § 35-3.1-1-11 (b) (2) (Burns 1975). The fact that the statements of each co-defendant reflected on the other co-defendants by implication is not justification, in itself, for a separate trial. *Frith* v. *State,* (1975) 263 Ind. 100, 325 N.E.2d 186.

### III.

Finally, the defendants argue that the trial court should have declared a mistrial when an FBI agent made the statement that "through one of the defendants we learned the location of where Special Agent Jackson's revolver had been thrown in Fall Creek. . . ." The granting of a mistrial rests within the discretion of the trial judge. *Austin* v. *State,* (1974) 262 Ind. 529, 319 N.E.2d 130; *Ballard* v. *State,* (1974) 262 Ind. 482, 318 N.E.2d 798; *Duke* v. *State,* (1968) 249 Ind. 466, 233 N.E.2d 159. The question of whether a mistrial should be granted is dependent upon the facts and circumstances of each case. *Duke* v. *State, supra.*

The facts in the record include the following: (1) earlier testimony had revealed the same facts regarding the revolver, and no objections were raised to that earlier testimony; (2) the jury knew that a fourth defendant was not being tried jointly with Bluitt, Whitfield, and Scott; (3) the jury knew that the fourth defendant was Jeffrey Wilson; and (4) the FBI agent's statement was given in the context of a narrative

regarding the course of the FBI investigation. The defendants' objections to the statement are: (1) the statement is hearsay, and (2) the statement was made with an intent to prejudice. The latter argument is waived since it was not included specifically within any defendant's motion to correct errors. Even if it were not waived, the defendants have failed to demonstrate affirmatively the prejudicial intent. Our reading of the record shows that the statement was presented as part of a chronological review of the FBI investigation.

Regarding the hearsay objection, we decline to characterize the statement as hearsay. As discussed herein, the statement was not offered as an assertion to show the truth of matters asserted within the statement. *See Patterson* v. *State,* (1975) 263 Ind. 55, 324 N.E.2d 482. Rather, the statement was simply an explanation as to why divers searched Fall Creek and came up with Jackson's revolver.

Additionally, we fail to see how harm resulted to the defendants. The record shows that the jury probably would have been able to draw an inference that the defendant referred to in the statement was Jeffrey Wilson. The prosecution offered to clarify the statement by naming Wilson as the defendant referred to. The trial court offered to admonish the jury to disregard the part of the statement making reference to one of the defendants giving information leading to the recovery of the gun. All three defendants declined the court's offer to admonish. As we have stated, there is no constitutional right to be protected from damaging evidence, *Frith* v. *State, supra;* since the trial court offered to clear up any misimplication by the jury, we perceive no abuse of discretion in denying the defendants' motion for a mistrial.

For all the foregoing reasons there was no trial court error, and the judgment of the trial court should be affirmed.

Judgment affirmed.

Givan, C.J., DeBruler, Prentice and Pivarnik, JJ., concur.

NOTE.—Reported at 381 N.E.2d 458.