**Danny KING, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 2–677A221.**

Court of Appeals of Indiana, Second District.

Dec. 17, 1979.

Rehearing Denied Jan. 25, 1980.

Stanley S. Brown, Public Defender, Lafayette, for appellant.

Theodore L. Sendak, Atty. Gen., Dennis K. McKinney, Deputy Atty. Gen., Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## STATEMENT OF THE CASE

Danny King (King) appeals from his conviction for unlawful dealing in hashish,[1] claiming error in (1) denying his Motion to Dismiss, (2) admission of testimony of a telephone conversation, (3) permitting a police officer to testify as an expert, (4) allowing the prosecution to attempt to examine a witness who refused to testify on the grounds of self-incrimination, (5) refusing to allow certain questions on cross-examination of a prosecution's expert witness, and (6) insufficiency of the evidence.

We affirm.

## FACTS

The evidence most favorable to the judgment is:

In August of 1975, John Hurlock, an officer with the Kokomo City Police, was working undercover as part of the Metropolitan Enforcement Group (MEG Unit) investigating drug sales in Tippecanoe County, Indiana. Karen Smith, an informant, was working under Hurlock's supervision.

On August 29, 1975, Smith contacted King by telephone for the purpose of arranging a hashish purchase. Following the telephone call, Smith and Officer Hurlock went to King's house. Inside King's house, Hurlock and King discussed the drug purchase. King stated that he had three quarters of an ounce of hashish and as Hurlock wanted only one-half ounce, he should return the next evening, giving King time to weigh and cut down the hashish.

The next night, the pattern repeated itself. Smith again telephoned King, and Smith and Officer Hurlock went to King's house. King came out of the house and got into the car with Officer Hurlock and Smith. He had not reduced the hashish to one-half ounce, so Officer Hurlock agreed to buy three-quarters of an ounce. King gave the hashish to Smith who passed it to Officer Hurlock, and in return Officer Hurlock passed the money through Smith to King.

Hurlock identified the substance which he purchased from King as hashish due to its appearance, texture, and by use of a chemical field test. The substance was later tested at the Indiana State Police laboratory and found to be approximately 18.5 grams of hashish.

King was indicted by a Tippecanoe County Grand Jury on January 29, 1976. The indictment was signed by George L. Hanna, special prosecutor for Tippecanoe County. The indictment was challenged by a motion to dismiss which, after a hearing, was denied.

## ISSUES

Six issues are presented for review:

I. Did the special prosecutor lack authority to sign the charging indictment thereby rendering it void and mandating dismissal of the action?

II. Did the trial court commit reversible error in admitting testimony by Officer Hurlock as to a telephone conversation between King and informant Smith?

---

1. Ind.Code 35–24.1–4.1–10 (repealed effective October 1, 1977).

III. Did the trial court abuse its discretion in allowing Officer Hurlock to testify as an expert in identifying the substance which he purchased from King?

IV. Did the trial court commit reversible error in allowing the State to ask Karen Smith a question after she indicated she would refuse to answer all substantive questions on the grounds of self-incrimination?

V. Did the trial court err in refusing to allow the prosecution's expert witness on controlled substances to be questioned on the statutory definitions of hashish and marijuana?

VI. Was there sufficient evidence that the substance purchased from King by Officer Hurlock was "dry hashish," the delivery of which was prohibited by Ind.Code 35–24.1–4.1–10 (repealed effective October 1, 1977).

For the sake of clarity, the parties' contentions will be set forth with the discussion of each specific issue.

## DECISION

*ISSUE ONE—Motion to Dismiss*

Was King's indictment improperly signed thereby necessitating that the trial court grant his Motion to Dismiss?

*PARTIES' CONTENTIONS* —King asserts the indictment was defective in that it was not signed by the proper person, that is, the elected prosecuting attorney of Tippecanoe County, James Kizer. King contends that the special prosecutor who signed the indictment, George L. Hanna, was without authority to do so because (1) there was no judicial determination of the factual basis for the prosecutor's disqualification, and (2) the special prosecutor had no authority to investigate or prosecute drug cases.

The State maintains that there is no requirement for a judicial determination if the regular prosecuting attorney has admitted his disqualification and requested appointment of a special prosecutor.

## ADDITIONAL FACTS

This issue revolves around the disqualification of the elected prosecutor of Tippecanoe County, James A. Kizer, and the appointment of special prosecutor, George L. Hanna. At the center of this controversy is the following order of disqualification:

Comes now James A. Kizer, Prosecuting Attorney for the 23rd Judicial Circuit.

It appears to the Court that certain allegations have been publicly made concerning possible criminal conduct by public officials and concerning the possible commission of crimes which have not been properly investigated or prosecuted, and that further allegations have been publicly made that the said prosecuting attorney has been influenced in the conduct of his office by political considerations.

It further appears to the Court that the interests of justice require that said allegations be made the subject of police and grand jury investigation.

And now *the said Prosecuting Attorney, in the interests of a full and free investigation* of all said allegations, *disqualifies himself* from participating therein, and requests the Court to appoint a special prosecutor to assist the police and grand jury in the investigation of all said allegations and to conduct the prosecution of any criminal charges which may arise therefrom.

Entered this 22nd day of October, 1975.

/s/ Warren B. Thompson
 Warren B. Thompson, Judge
 Tippecanoe Circuit Court

/s/ Robert F. Munro
 Robert F. Munro, Judge
 Superior Court
 of Tippecanoe County

/s/ Jack A. King
 Jack A. King, Judge
 Superior Court No. 2 of
 Tippecanoe County

/s/ James A. Kizer
 James A. Kizer, Prosecuting Attorney
 for the 23rd Judicial Circuit

(emphasis supplied)

According to evidence presented at the hearing on the Motion to Dismiss, the three judges prepared the order in advance of a meeting with Kizer. At an hour-long meeting on October 22, 1975, Kizer signed the disqualification order. That same day, the three judges signed an order appointing George L. Hanna as special prosecutor.[2]

At the hearing on the Motion to Dismiss, extensive testimony was taken, including testimony from Kizer, Judge King, and Judge Munro. Following the hearing, the trial court found that Kizer's signature upon the order was voluntary and not the result of duress, fraud or threats;[3] that the scope of authority of the special prosecutor included particular classes of crimes which had not been properly prosecuted or investigated; and that the crime with which King was charged (dealing in hashish) was included within the scope of the special prosecutor's authority.[4]

CONCLUSION—The special prosecutor had authority to sign King's indictment, and therefore the Motion to Dismiss was properly overruled.

■ King pursues a will-o'-the-wisp. The Indiana cases have long held that if an elected prosecutor admits his disqualification and requests appointment of a special

prosecutor, a judicial determination of the factual basis for such disqualification is *not* necessary. *See Perfect v. State* (1925), 197 Ind. 401, 141 N.E. 52; *State ex rel. Williams v. Ellis* (1915), 184 Ind. 307, 112 N.E. 98. *See also State ex rel. Goldsmith v. Superior Court of Hancock County* (1979), Ind., 386 N.E.2d 942.

Reason governs these decisions. If a prosecutor believes himself to be incapacitated or disqualified to such a degree that he cannot properly perform *some or all of his duties*, it would seem superfluous to require a court to hold a hearing, receive evidence and make findings in order to merely confirm his belief. Such a procedure is not required of a judge who disqualifies himself. This court is in no position to second guess a prosecutor's decision as to his own disqualification—whether that disqualification be as to one case, or as to a more general classification of cases. This is within the discretion and judgment of the prosecutor in fulfilling the duties of his office. Whether he is properly fulfilling those duties is ultimately for the judgment of the voters—not the courts.

■ This situation of voluntary disqualification by the prosecutor differs from

---

**2.** *ORDER APPOINTING SPECIAL PROSECUTING ATTORNEY*

WHEREAS, it appears that certain allegations have been publicly made concerning possible criminal conduct by public officials and concerning the possible commission of crimes which have not been properly investigated or prosecuted, and that further allegations have been publicly made that the said prosecuting attorney has been influenced in the conduct of his office by political considerations; and

WHEREAS, it appears that the interests of justice require that said allegations be made the subject of police and grand jury investigation; and

WHEREAS, James A. Kizer, Prosecuting Attorney, in the interests of a full and free investigation of all of said allegations has disqualified himself from participating therein and requested the appointment of a Special Prosecutor to assist the police and grand jury in the investigation of all of said allegations.

NOW, THEREFORE, the judges of the Tippecanoe Circuit Court, Superior Court of Tippecanoe County and Superior Court No. 2 of Tippecanoe County do hereby appoint George L. Hanna as such Special Prosecutor to assist the

police and grand jury in the investigation of said allegations and conduct the prosecution of any criminal charges which may arise therefrom.

Entered this 22nd day of October, 1975.

/s/ Warren B. Thompson
 Warren B. Thompson, Judge
 Tippecanoe Circuit Court

/s/ Robert F. Munro
 Robert F. Munro, Judge
 Superior Court
 of Tippecanoe County

/s/ Jack A. King
 Jack A. King, Judge
 Superior Court No. 2 of
 Tippecanoe County

**3.** This issue was asserted in the Motion to Dismiss but not raised upon appeal.

**4.** These latter findings were stated in negative terms, i. e., "The . . . crimes charged . . . are not excluded from the scope of the said [Special] Prosecutor's authority."

one in which the elected prosecutor *opposes* appointment of a special prosecutor. In the latter situation, judicial determination of the factual basis for disqualification must be made prior to the special prosecutor's appointment. *State ex rel. Spencer v. Criminal Court of Marion County* (1938), 214 Ind. 551, 15 N.E.2d 1020, 16 N.E.2d 888; *State ex rel. Purcell v. Circuit Court of Sullivan County* (1950), 228 Ind. 410, 92 N.E.2d 843; *State ex rel. Latham v. Spencer Circuit Court* (1963), 244 Ind. 552, 194 N.E.2d 606. This prevents the arbitrary judicial usurpation of the powers of a constitutional office—that of prosecutor.[5] The prosecuting attorney is a constitutional officer, *State ex rel. Spencer v. Criminal Court of Marion County, supra*; *State ex rel. Latham v. Spencer Circuit Court, supra*, and is not subject to an arbitrary order of disqualification at the whim of a trial judge.[6] *State ex rel. Williams v. Willis, supra*; *State ex rel. Purcell v. Circuit Court of Sullivan County, supra*. *State ex rel. Williams v. Ellis, supra*, spells out this limitation:

> We do not hold that, because the judge of some court might be of the opinion that a given cause might be better prosecuted by some one other than the regular official, he would therefore be warranted in appointing such other person as special prosecutor. Neither lack of intellect, learning, nor even moral courage, in prosecuting attorney, judge, or other elective officer, constitutes a disqualification to act officially, and a judge would no more be justified in supplanting a prosecuting attorney for such deficiency, than would the latter be warranted in demanding a

more learned, conscientious, and capable judge to hear the causes he must prosecute. The responsibility for lack of capacity in officers must rest on the people who elected them.

184 Ind. at 321, 112 N.E. at 103.

*State ex rel. Spencer v. Criminal Court of Marion County, supra,* elaborates on the need for judicial determination of the basis for disqualification if the regular prosecuting attorney objects:

> It cannot be doubted that, where it is established that the prosecuting attorney is an interested party, or otherwise clearly incapacitated, the court may appoint an attorney to represent the interests of the state. But this may not be done upon mere suspicion or rumor, and upon the mere ex parte motion of the judge, and *the decisions disclose that in the cases where the appointment of a special prosecutor was upheld, the regular prosecutor had admitted disqualification or incapacity.* The reasoning in the opinions would seem to clearly indicate that *a special prosecutor may not be appointed* to exercise the functions of the office *over the objection of the regular prosecuting attorney, without a judicial determination of the fact of disqualification* or interest after an opportunity for the regular prosecutor to be heard. It may not be done upon the mere suspicion of the judge that the prosecutor may not adequately and impartially perform his duties. (Emphasis added)

214 Ind. at 556–57, 15 N.E.2d at 1022–23.

■ King would also invalidate the indictment signed by the special prosecutor[7]

---

**5.** See *Sapienza v. Hayashi* (1976), 57 Haw. 289, 554 P.2d 1131. A court order of disqualification *opposed by the prosecutor* was struck down as overbroad when its scope extended beyond the factual basis established for the disqualification.

**6.** The statutory authority to replace a prosecutor with a special prosecutor is found in Ind. Code (1971) 33–14–1–5, which states:

> Failure to attend court.—If any prosecuting attorney fail to attend any court of his circuit, as the case may be, the judge of such circuit shall appoint some person to prose-

cute for such term who shall receive the docket fees of such term, and, if the appointment be made in the circuit court, such additional compensation as the court may deem reasonable to be drawn from the state treasury on the allowance of the court and which allowance shall be deducted from the salary of such prosecutor.

**7.** The order appointing the Special Prosecutor stated, in part:

> WHEREAS, it appears that certain allegations have been publicly made . . . concerning the possible commission of crimes

because "drug cases" were not within his authority. King does not question that the scope of the special prosecutor included certain classes of crimes which had not been properly investigated or prosecuted. However, he does question whether "drug cases" fell within that classification, relying on the instructions given to the Grand Jury which returned his indictment to support his position. But he has failed to include such instructions in the record, and therefore has waived this argument. *Mendez v. State* (1977), Ind., 370 N.E.2d 323; *Schuman v. State* (1976), 265 Ind. 586, 357 N.E.2d 895; *Pulliam v. State* (1976), 264 Ind. 381, 345 N.E.2d 229.

■ Further, King asserts that the evidence at the Motion to Dismiss hearing showed that drug violations in Tippecanoe County had been properly investigated and prosecuted. However, there was evidence to the contrary.

John C. Dibble, a former deputy prosecutor who had been dismissed by Kizer, testified that drug cases had not been properly prosecuted. He specifically cited a series of cases resulting from a March, 1974 drug raid. Kizer did nothing with the cases after his taking of office on January 1, 1975. The Prosecutor's office manager brought these cases to the attention of Dibble in March, 1975. At that time, there were discovery motions from the defense still outstanding which had not been answered, and the cases were perilously close (7 to 10 days) to lapsing under Crim.R. 4.

Dibble further testified that there were no "concerted" drug investigations in Tippecanoe County in 1975 by the local law enforcement agencies. This was in accord with Lafayette Police Chief Butler's policy of having police respond only to complaints made. No offensive-type affirmative police investigations (such as undercover drug investigations) were being made.

which have not been properly investigated or prosecuted. . . .

NOW, THEREFORE, the judges of . . . Tippecanoe County do hereby appoint

On September 10, 1975, Dibble complained to Kizer that Police Chief Butler was an impediment to law enforcement in the county, and that Kizer should talk to the Lafayette mayor about it immediately. Kizer agreed to do so. However, when Dibble later inquired about Kizer talking to the mayor, Kizer stated he had taken care of the matter with Tom Heide, Lafayette City Attorney.

Dibble also testified that at that time (and for several years previously), Heide's law firm of Heide, Gambs and Mucker was representing Michael Weatherford. Weatherford, in turn, was being investigated as a major drug offender by the Federal MEG Unit investigating drug offenses in Tippecanoe County.

Dibble further testified that during his tenure as chief deputy prosecutor there were arrests and prosecutions for drug violations. But those arrests were in connection with other crimes. No solely drug-related arrests were made in the City of Lafayette during his tenure.

Additionally, Kizer, the elected prosecutor, testified that he had never instituted any type of legal action to challenge the special prosecutor's authority to deal with this type of case.

This evidence supports the trial court's determination that "drug cases" were within the types of crimes not being properly investigated or prosecuted, and therefore were within the scope of the special prosecutor's authority.

Although not argued by the parties, there is an alternative basis upon which to uphold the trial court's refusal to dismiss the indictment.

■ King correctly asserts in his brief that criminal prosecutions cannot be instituted by private individuals. *Johnson v. White Circuit Court* (1948), 225 Ind. 602, 77 N.E.2d 298. However, this case was not

George L. Hanna as such Special Prosecutor to assist the police and grand jury in the investigation of said allegations and conduct the prosecution of any criminal charges which may arise therefrom.

instituted by a private individual. Rather it was initiated by a special prosecutor who, at minimum, was a de facto public official.[8]

 The acts of a de facto public official may not be collaterally attacked. *Fruit v. Metropolitan School District of Winchester-White River Township* (1971), 241 Ind. 621, 172 N.E.2d 864; *State ex rel. Crowmer v. Superior Court of Marion County* (1957), 237 Ind. 633, 146 N.E.2d 88. This proposition is so deeply rooted that in 1892 the Indiana Supreme Court stated:

> The rule that the acts of an officer *de facto*, performed before ouster, are, as to the public, as valid as the acts of an officer *de jure*, is too familiar to the profession to need the citation of authority. The public is not to suffer because those discharging the functions of an officer may have a defective title, or no title at all. *Case v. State*, 69 Ind. 46; *Blackman v. State*, 12 Ind. 556; *Bansemer v. Mace*, 18 Ind. 27; *Mowbray v. State*, 88 Ind. 324.

*Parker v. State ex rel. Powell* (1892), 133 Ind. 178, 200, 32 N.E. 836, 843.

This applies to prosecutor as it does to judges, *see State ex rel. Crowmer v. Superior Court of Marion County, supra*, legislators, *see Fruit v. Metropolitan School District, supra*, and other public officials. Therefore an indictment signed by a de facto special prosecutor is not subject to *collateral* attack by a motion to dismiss.

> An indictment signed by a de facto prosecuting attorney will not be held void when attacked by accused on the ground of his want of authority.

42 C.J.S. Indictments & Informations § 57 at 912.

 The validity of acts of a public officer may be challenged only by a direct challenge against the individual who purports to hold the office. *Fruit v. Metropolitan School District, supra. See, e. g., State ex rel. Latham v. Spencer Circuit Court, supra; State ex rel. Purcell v. Circuit Court of Sullivan County, supra; State ex rel. Spencer v. Criminal Court of Marion County, supra; State ex rel. Williams v. Ellis, supra. See also State ex rel. Goldsmith v. Superior Court of Hancock County, supra. But see, e. g., Perfect v. State, supra.* Such a procedure was not followed in this case.

The indictment not being subject to the type of attack mounted against it, the trial court's overruling of the motion to dismiss was proper.

ISSUE TWO—*Hearsay Evidence*

Did the trial court err in admitting Officer Hurlock's testimony as to telephone conversations between informant Karen Smith and King over the defendant's hearsay objection?

*PARTIES' CONTENTIONS*—King asserts that Hurlock's testimony fit the definition of hearsay evidence and therefore was inadmissible, and furthermore, the court failed to instruct the jury that it should consider the evidence for a limited purpose only.

The State maintains that the statement was not hearsay because the declarant was available for cross-examination.

*CONCLUSION*—The admission of Hurlock's testimony, even if in error, was harmless, and therefore does not require reversal. *See* Ind.R.Tr.P. 61.

At issue is the following trial court testimony by Officer Hurlock:

Q. All right. Then in August of '75, what was the first contact you and Karen Smith had with Danny King?

A. The first contact was by telephone.

Q. And can you tell us when that was?

A. That was on the 29th of August; roughly, in the area of 10:00—10:30 p. m.

Q. Who called who?

A. Karen Smith called Danny King.

Q. And what did Karen Smith say to Danny King?

BY MR. MOORE: Objection. Hearsay.

---

8. Blacks' Law Dictionary (4th ed. 1968) defines de facto as "an office, position or status existing under a claim or color of right."

BY MR. McGLONE: It is not hearsay. It was said to Danny King; said in his presence, albeit over the phone. It's simply a matter of what he heard her say. It's not out of the presence of the Defendant. It isn't hearsay.

BY MR. MOORE: Well, Your Honor, there's no showing that the Defendant was present in this phone conversation. He was just—I assume, he was with Karen Smith on one end of the phone and he doesn't know who's on the other end of the phone and that makes it hearsay.

BY THE COURT: Overruled. Go ahead.

Q. What did she say over the phone?

A. She asked Danny if he had had any— it's—if he had, at that time, any hash.

Q. And then, without asking you what she said to you,—which I think would be hearsay—did she say anything then? Did—What was the rest of the conversation or was there any further?

A. She indicated to me in the affirmative that he indicated that he did have and she asked him how much he had and then she told me—or asked me how much I wanted to buy. I told her, at that time, if he had a half ounce that I would take it. And then she relayed that to Mr. King.

Traditionally, hearsay evidence is defined:

Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.

*Harvey v. State* (1971), 256 Ind. 473, 476, 269 N.E.2d 759, 760.

■ There is no merit to the State's claim that the declarant, Karen Smith, was available for cross-examination. Karen Smith asserted her fifth amendment privilege against self-incrimination and refused to answer any substantive questions as to the matter before the court. A witness who exercises a privilege and does not testify is not available for cross-examination. McCormick on Evidence § 253 (2d ed. 1972).

Turning to the nature of Hurlock's testimony, a non-participant to a telephone conversation may testify as to its occurrence. *See generally, Bean v. State* (1978), Ind., 371 N.E.2d 713; 22A C.J.S. *Criminal Law* § 718 at 998. *See also Walker v. State* (1976), 265 Ind. 8, 349 N.E.2d 161, *cert. den.* 429 U.S. 943, 97 S.Ct. 363, 50 L.Ed.2d 313. But a non-participant's statement as to the truth of the matters asserted in the telephone conversation falls within the hearsay rule.[9] 22A C.J.S. *Criminal Law* § 718 at 997. *See Walker v. State, supra. See generally Harvey v. State, supra* (definition of hearsay).

■ However, in this case, admission of the statements was harmless beyond a reasonable doubt. The events which took place in the presence of Officer Hurlock provided overwhelming evidence to support the conviction. *See Mayes v. State* (1974), 162 Ind.App. 186, 318 N.E.2d 811; *Wills v. State* (1974), 162 Ind.App. 159, 318 N.E.2d 385. Officer Hurlock and King twice engaged in "face to face" negotiations for the drug sale; in these *direct* talks, King stated that he had possession of three quarters of an ounce of hashish; and finally, King sold the hashish directly to Officer Hurlock while sitting in Hurlock's car.

*ISSUE THREE—Expert Qualifications*

Did the trial court err in allowing Officer Hurlock to testify as an expert regarding

---

**9.** There is authority that Officer Hurlock's statement was not hearsay. What is normally "hearsay" testimony may be admissible to show the reason for further investigation by the police. *McNew v. State* (1979), Ind., 391 N.E.2d 607; *Bluitt v. State* (1978), Ind., 381 N.E.2d 458; *Boles v. State* (1973), 259 Ind. 661, 291 N.E.2d 357; *Wills v. State* (1974), 162 Ind. App. 159, 318 N.E.2d 385. *But see Glover v. State* (1969), 253 Ind. 121, 251 N.E.2d 814; *Mayes v. State* (1974), 162 Ind.App. 186, 318 N.E.2d 811 (hearsay information gathered by police during an investigation is not competent evidence). However, this theory was not raised by the State, and we need not base our resolution of this issue upon it.

his opinion as to the nature of the substance which he purchased from King?

*PARTIES' CONTENTIONS*—King asserts the trial court abused its discretion in allowing Officer Hurlock to testify as to the nature of the substance he purchased from King in that, (1) a narcotics officer is not *per se* an expert in the identification of controlled substances, and (2) Officer Hurlock was not qualified to testify as to the results of the chemical field test which he performed.

The State contends there was no abuse of discretion, and in any event, any error was harmless because other testimony identified the controlled substance.

*CONCLUSION*—The trial court did not abuse its discretion in allowing Officer Hurlock to testify as to the nature of the substance which he purchased from King.

Determination of whether or not a witness is qualified to testify as an expert is within the sound discretion of the trial court and may not be set aside unless there is a manifest abuse of discretion. *Epps v. State* (1977), Ind., 369 N.E.2d 404; *Niehaus v. State* (1977), 265 Ind. 655, 359 N.E.2d 513; *Pettit v. State* (1972), 258 Ind. 409, 281 N.E.2d 807. A witness may be qualified by both training and practical experience. *Blair v. State* (1977), Ind.App., 364 N.E.2d 793; *Ross v. State* (1977), Ind. App., 360 N.E.2d 1015.

Officer Hurlock testified that he had seen a great deal of hashish as the result of his experience in drug investigations. Because of his frequent contact with hashish, Officer Hurlock was familiar with the color, texture and appearance of the controlled substance. Allowing the officer to testify on this basis was not an abuse of discretion. *See State v. Lewman* (1973), 158 Ind.App. 550, 303 N.E.2d 668 (undercover drug investigator competent as an expert to identify hashish based on his experience). *See also Telfare v. State* (1975), 163 Ind. App. 413, 324 N.E.2d 270 (witness not required to be a chemist to qualify to identify marijuana).

As to the Dueguenois-Levine chemical field test which Officer Hurlock conducted on the controlled substance, the results of the test were properly admitted by the trial court. In order for such test results to be admissible our Supreme Court has held:

> We do not go so far here as to hold that a complete and detailed description of scientific tests forming the basis of the witness' opinion must be included in a proper foundation. Under circumstances such as these, *it is only necessary that the type of test be identified and generally described and that the person doing the testing also be identified.* It is within the discretion of the trial court to require more than this should circumstances so warrant. (Emphasis added).

*McDonald v. State* (1976), 265 Ind. 167, 172, 352 N.E.2d 708, 712.

Officer Hurlock identified and generally described the test which he conducted. A person administering a chemical test may testify as to its results even though he has no understanding of the reason for the chemical reaction which occurred. *Reid v. State* (1978), Ind., 372 N.E.2d 1149.

It was not error to admit Officer Hurlock's testimony as to the nature of a controlled substance.

As pointed out by the State, even had error been committed in this regard, it would have been harmless because State Police chemist Freddie Lee Huttsell testified that chemical tests showed the substance to be hashish. (Admission of improper evidence which tends only to disclose a fact clearly proved by other legitimate and uncontroverted evidence is harmless error. *Sexton v. State* (1974), 262 Ind. 554, 319 N.E.2d 829).

*ISSUE FOUR—Questioning of Informant*

Did the trial court err in allowing the prosecution to ask, in the presence of the jury, if witness Karen Smith would continue to claim her fifth amendment privilege as to the matters before the court?

*PARTIES' CONTENTIONS*—King contends that it was error for the prosecution to elicit informant Karen Smith's response that she would assert her privilege against self-incrimination after it had been determined outside the presence of the jury that she would assert this privilege. The State says any error was waived because of a failure to make a timely objection.

*CONCLUSION*—King waived any error by failure to make a proper objection at trial.

■■■ It is axiomatic that failure to object at trial waives an issue on appeal. *Cooper v. State* (1972), 259 Ind. 107, 284 N.E.2d 799; *Harrison v. State* (1972), 258 Ind. 359, 281 N.E.2d 98; *Burgett v. State* (1974), 161 Ind.App. 157, 314 N.E.2d 799. We find nothing in the record that can be regarded as a timely objection to the State asking Karen Smith in the presence of the jury if she would continue to claim her fifth amendment privilege. In fact we find no objection at all relating to this issue.

■■■ The sequence of events at the trial make it evident that a proper objection was not made. Karen Smith was called to the witness stand. Following preliminary identification questions, she was asked four questions to which she responded that she was "pleading the fifth." None of the questions drew any objection from the defense attorney relevant to the issue at hand. Following Smith's fourth refusal to answer, the trial judge called counsel to the bench, and after a conference, the defense attorney made the following statement:

BY MR. MOORE:

At this time, before Karen Smith testified, I made an objection to her being called to testify based on the fact that we knew that she was going to raise the Fifth Amendment [10] and having that done in front of the juror—jury. I ask that—that we go through this out of the presence of the jury and decide what she's going to ask—that record was made before the testimony and we're now putting it on the record.

We glean from this statement only a request for a hearing outside the presence of the jury to determine the extent to which the witness was going to claim her fifth amendment privilege. Outside the presence of the jury it was determined that Smith would continue to claim her privilege as to any substantive matters before the court. There was no further objection (if indeed the above statement by the defense counsel was an objection), nor was there any request to prevent any further questioning of Smith or to require her immediate removal from the witness stand before the jury returned.

When the jury returned, the following transpired:

BY THE COURT: Mr. McGlone, are you withdrawing your last question?

BY MR. McGLONE: Well, in the light of the witness's assertion of the Fifth Amendment, yes, Your Honor.

BY THE COURT: Proceed.

CONTINUED DIRECT EXAMINATION OF KAREN SMITH:

QUESTIONS BY MR. McGLONE:

Q Karen, is it your intention to not answer any questions or to assert the Fifth Amendment to any questions I might ask concerning the transaction involving Danny King and John Hurlock?

A Yes.

BY MR. McGLONE: In the light of that, Your Honor, the—the State will not ask any further questions of this witness.

BY THE COURT: You've asked some. Do you have any cross-examination?

CROSS–EXAMINATION OF KAREN SMITH:

QUESTIONS BY MR. MOORE:

Q If the Defendant asked the questions, would you still assert the Fifth Amendment?

A I've never thought about that. I guess I would.

---

10. We have been directed to no such objection in the record nor does our own search of the record reveal such a prior objection. Failure to include matters alleged but not included in the record result in a waiver of that issue. *Mendez v. State* (1977), Ind., 370 N.E.2d 323.

BY MR. MOORE: No further questions. .

BY THE COURT: You may step down.

 It is the prosecution's question after the return of the jury which King claims was in error. However, his failure to make a proper timely objection has waived this issue.[11]

*ISSUE FIVE—Limiting Cross-Examination*

Did the trial court err in refusing to allow the defendant to cross-examine an expert witness for the State as to the legal definitions of controlled substance, hashish and marijuana.

*PARTIES' CONTENTIONS*—King contends such cross-examination should have been allowed as the State opened the door to the subject when the witness testified his job was to test materials to determine their legality.

The State maintains that questioning a witness as to his opinion about Indiana law is improper.

*CONCLUSION*—The trial court did not err in refusing to allow cross-examination of the witness as to his opinions about Indiana law.

 The conduct of cross-examination is within the sound discretion of the trial court and is reversible only for an abuse of discretion. *Strickland v. State* (1977), 265 Ind. 664, 359 N.E.2d 244; *Ringham v. State* (1974), 261 Ind. 628, 308 N.E.2d 863; *Taylor v. State* (1976), Ind. App., 358 N.E.2d 167; *Traylor v. State* (1975), 164 Ind.App. 50, 326 N.E.2d 614.

Questions of law are not an appropriate subject for a witness's opinion and are properly excludable. *Ledcke v. State* (1973), 260 Ind. 382, 296 N.E.2d 412; *Baker v. State* (1964), 245 Ind. 129, 195 N.E.2d 91. *See Sexton v. State* (1974), 262 Ind. 554, 319 N.E.2d 829.

*Ledcke v. State, supra,* presented a situation very similar to the case at bar. There our Supreme Court stated:

Appellant next claims that it was erroneous to sustain the State's objection to the following question which appellant's attorney asked of one of the police officers on cross-examination:

"In your education program of yourself, Officer Stillwell, have you determined what part of the plant is legal to possess and what part is not legal to possess?"

This was properly excludable because it involved a question of law and therefore not an appropriate subject of an opinion. 260 Ind. at 394, 296 N.E.2d at 420.

The trial court correctly excluded the defense counsel's questions on cross-examination.

*ISSUE SIX—Insufficient Evidence*

Was there sufficient evidence that King delivered "dry hashish" as prohibited by Ind.Code 35–24.1–4.1–10 (repealed effective October 1, 1977).

*PARTIES' CONTENTIONS*—King asserts there was insufficient evidence that the hashish which Hurlock purchased from King was "dry hashish" as stated in Ind. Code 35–24.1–4.1–1. The State's position is that the legislature has recognized two forms of hashish, dry hashish and hashish oil, and that there was sufficient evidence that the hashish purchased by Hurlock was not an oil, but rather the dry form of the controlled substance.

*CONCLUSION*—There was sufficient evidence that the hashish delivered was "dry hashish" as prohibited by the statute.

Ind.Code 35–24.1–4.1–10 (repealed effective October 1, 1977), under which King was convicted stated (in pertinent part):

[A] person is guilty of unlawful dealing in marijuana or hashish if he:

(1) knowingly manufactures or delivers marijuana or *dry hashish*, pure or adulterated

(emphasis added)

---

11. It is evident also that any error would have been harmless in light of the defense asking a virtually identical question which produced the same information.

Indiana's Controlled Substances Laws in effect at the time recognized two forms of hashish: dry hashish and hashish oil.[12]

Words used in a statute, unless specifically defined in that statute, are given their plain, ordinary and usual meaning. *State v. Apex Steel and Supply Co.* (1978), Ind.App., 375 N.E.2d 598; *State v. Turner* (1979), Ind.App., 386 N.E.2d 208. Ind.Code 1971, 1–1–4–1. Given its usual meaning, oil is a liquid substance at room temperature. Dry, on the other hand, in the context of being used in contrast to the word oil, means a solid, non-liquid substance [13] (i. e., dry as compared to a liquid, an oil, or a lotion).

Using these plain, ordinary and usual meanings of these words,[14] we find there was sufficient evidence to sustain King's conviction. Officer Hurlock described the hashish as a compressed brown substance which looked similar to a shoe sole. Furthermore, the hashish itself was introduced into evidence therefore allowing the jury to observe its nature.

Thus, there is sufficient evidence from which the jury could find that the hashish delivered was dry hashish, as stated in Ind. Code 35–24.1–4.1–10.

Affirmed.

SULLIVAN, J., concurs with opinion.

MILLER, P. J., dissents with opinion.

SULLIVAN, Judge, concurring.

I concur in the affirmance of King's conviction. I do not, however, concur in the implication of Chief Judge Buchanan's lead opinion that Officer Hurlock's testimony concerning a telephone call between Smith and King was not hearsay. (See particular-ly Footnote 9 at page ———.) The majority's emphasis on *Bean v. State* (1978) Ind., 371 N.E.2d 713 and *Walker v. State* (1976) 265 Ind. 8, 349 N.E.2d 161, *cert. den.* 429 U.S. 943, 97 S.Ct. 363, 50 L.Ed.2d 313, may mislead the unwary reader. Both cases are inapplicable to the extent that they are relied upon to implicate King through hearsay.

In *Bean, supra*, the defendant sought to testify about a conversation he had had with two friends prior to a robbery. The court there adopted the defendant's proposition that the testimony was admissible as proof of making the statement, but not as proof of the matter asserted therein. The *Walker* case, *supra*, held that testimony establishing the occurrence of a telephone conversation was permissible whereas any references to the content thereof were not. However, neither of these cases supports this court's suggestion that a non-participant can testify as to the identity of the person on the other end of the phone. Here, there was no evidence that Officer Hurlock knew King's phone number, watched Smith dial, or heard the recipient's voice. At best, Hurlock from personal knowledge could testify only that Smith made a phone call and appeared to converse with someone.

In Footnote 9, Chief Judge Buchanan states that the questionable testimony may be admitted under an exception to the hearsay rule. He asserts: "What is normally 'hearsay' testimony may be admissible to show the reason for further investigation by the police." In limited situations this principle bears some validity, but not in the case before us. As in *Mayes v. State* (1974) 162 Ind.App. 186, 193–94, 318 N.E.2d 811, 815:

12. *See* Ind.Code 35–24.1–4.1–9(3) (repealed effective Oct. 1, 1977):
 (3) the term "paraphernalia" means any instrument, device, article, or contrivance used, designed for use, or intended for use in ingesting, smoking, administering, or preparing marijuana, hashish, *hashish oil*, or cocaine. . . . (emphasis added)

13. We take judicial notice that this comports with the forms hashish takes: the "normal"

form of hashish which is created by a drying process, and hashish oil which is a more potent, concentrated liquid.

14. This definitional problem created by Ind. Code 35–24.1–4.1–10 has been cured in the new Indiana Penal Code. The new statute, Ind. Code 1977, 35–48–4–10, has dropped the qualifying word "dry" from the dealing in marijuana or hashish statute.

. . . we are not here concerned with a probable cause for arrest or with a search and seizure, the validity of which depends upon the reliability of an informant. . . . And we might . . . conclude that the testimony was not . . introduced merely to explain why the officers proceeded to 30th and Illinois but rather was intended to serve as an additional weapon in the evidentiary arsenal . . . . ."

In *Glover v. State* (1969) 253 Ind. 121, 126, 251 N.E.2d 814, 818, the court explained:

"Hearsay testimony that law enforcement officers use and rely upon for investigation and the gathering of competent and material evidence, of course is not evidence properly to be used in the trial of a criminal case."

In the context of the question asked of Officer Hurlock, it is readily apparent that the testimony was elicited for the sole purpose of proving the truth of the matters therein asserted. *See: Carr v. State* (3d Dist. 1979) Ind.App., 388 N.E.2d 603. Accordingly, it was hearsay and was improperly admitted. However, in view of the overwhelming evidence against King, I agree that the error in admission was harmless and therefore not cause for reversal.

I further concur in Chief Judge Buchanan's treatment of the other issues before us.

MILLER, Presiding Judge (sitting by designation).

I respectfully dissent.

I do not agree with the Majority that the hearsay testimony of Officer Hurlock as to an alleged telephone conversation between Karen Smith and Defendant King was harmless beyond a reasonable doubt.

The alleged conversation contained an admission by King that he possessed hashish. Testimony of a police officer as to extrajudicial statements by a third person, not a witness at trial, concerning admissions allegedly made by a defendant in the presence of such a third person is hearsay and its admission is reversible error. *Harvey v.*

*State* (1971), 256 Ind. 473, 269 N.E.2d 759. As stated in *Glover v. State* (1969), 253 Ind. 121, 251 N.E.2d 814, at 818:

". . . Hearsay testimony that law enforcement officers used and rely upon for investigation and gathering of competent and material evidence, of course is not evidence properly to be used in the trial of a criminal. case . . ."

Accord: *Carr v. State* (1979), Ind.App., 388 N.E.2d 603.

The Majority concludes that the uncorroborated testimony of Officer Hurlock concerning the events surrounding the alleged purchase constituted "overwhelming" evidence of King's guilt and the prejudicial hearsay testimony was therefore rendered harmless citing *Mayes v. State* (1974), 162 Ind.App. 186, 318 N.E.2d 811 and *Wills v. State* (1974), 162 Ind.App. 159, 318 N.E.2d 385. Thus, the issue presented is whether the testimony of one credible witness, in this case a police officer but oftentimes a victim, constitutes "overwhelming" evidence of a defendant's guilt. *Mayes, supra,* and *Wills, supra,* do not support the Majority's position. In *Mayes, supra,* numerous police officers observed the commission of the crime. In *Wills, supra,* two officers participated in the search and seizure of a concealed weapon. Further, in *Gillman v. State* (1979), Ind., 389 N.E.2d 327, our Supreme Court concluded that "the evidence of guilt was overwhelmingly established by the eyewitness testimony of numerous police officers." (Emphasis Added). Again, in *Moore v. State* (1972), 258 Ind. 200, 280 N.E.2d 57, where the defendant was apprehended in the act of attacking the victim by two co-workers and held for the police, the Court held the evidence of guilt to be "overwhelming."

Officer Hurlock revealed that after the alleged sale he retained the hashish in his personal possession, allegedly locked in his desk drawer for a period of twelve days before delivering it to the State Police chemist. There was no evidence as to where his desk was located. After it was returned to him by the chemist, Hurlock, for the first time, placed it in the police

property room. Although this testimony was sufficient to establish chain of custody, still this delay of twelve days before the evidence was placed in normal police channels raises the question of possible substitution, tampering and/or mistake.

In *Jones v. State* (1973), 260 Ind. 463, 296 N.E.2d 407, 409 our Supreme Court stated:

". . . A high degree of scrutiny must be placed on goods of a fungible nature such as heroin, especially where, as here, the evidence is an essential element of the crime. See *Guthrie v. State* (1970), 254 Ind. 356, 260 N.E.2d 579. We are faced with a ten-day period during which the State has not explained what security measures, if any, were taken to maintain the integrity of the exhibits. However, unlike *Graham*, [*Graham v. State*, 1970, 253 Ind. 525, 255 N.E.2d 652], we are not faced with a complete and unexplained break in the chain. The only officers who were known to handle the exhibits testified at the trial.

We are not here concerned with absolute certainty, but with probabilities. The mere possibility that the evidence might have been tampered with will not make the evidence totally objectionable . . ."

In the regular course of a controlled substance seizure, the drugs are delivered without delay and usually within a few hours to a designated, secure storage area such as a safe or property room under control of the particular police agency. This, unfortunately, was not done in the case before us. Here, in my opinion, the twelve days in which the evidence was kept in the personal possession of Officer Hurlock, rather than being placed immediately in the secured police property room, contributed substantially to the opportunity for substitution, tampering or mistake. The jury could reasonably have inferred, among other things, that Officer Hurlock, who testified he made numerous drug purchases, was in the habit of retaining seized controlled substances in his personal possession and, thus, the evidence from another "buy" could have been mistakenly substituted by Officer Hurlock for the evidence in this case.

In conclusion, because Officer Hurlock was the only witness to the alleged sale and, further, because of the long delay during which the evidence was personally retained by said Officer, I do not consider the evidence in this case to be "overwhelming" nor can I say that I have "no reasonable doubt that the average jury would reach the same result" without the improper testimony. *Gilman, supra.* The admission of the prejudicial hearsay evidence did not constitute harmless error.

I agree with the Majority that George L. Hanna, the special prosecutor, was a de facto public official and the indictment signed by Hanna was not subject to *collateral* attack by a motion to dismiss. Thus the result reached by my colleagues on this issue was correct.

However, I disagree with the Majority in that I find the Judges of Tippecanoe County acted erroneously in issuing their Order appointing the special prosecutor. Such Order was clearly overbroad and vague. Our statute, *Ind. Code* (1971), 33–14–1–5, and case law authorize the appointment of a special prosecutor in a particular case of specific class of cases where the regular prosecutor has a conflict. In the case of his total incapacity, a special prosecutor may be appointed to fulfill all his duties. However, our law does not contemplate the existence of two public prosecutors within the same jurisdiction exercising the same or similar functions, a situation which is created by the Order in question.

Chief Judge Buchanan states:

"This Court is in no position to second guess a prosecutor's decision as to his own disqualification—whether that disqualification be as to one case, or as to a more general classification of cases. This is within the discretion and judgment of the prosecutor in fulfilling the duties of his office. Whether he is properly fulfilling those duties is ultimately for the judgment of the voters—not the courts."

I disagree. A prosecutor cannot be disqualified at the whim of a trial judge. *State ex rel. Williams v. Ellis* (1915), 184 Ind. 307,

112 N.E. 98. I also believe a prosecutor may not disqualify himself at his own whim merely because the prosecution may appear to him to be unpleasant or inconvenient. The Code of Professional Responsibility for Attorneys At Law adopted by our Supreme Court provides, in part:

> ". . . While a lawyer should guard against otherwise proper conduct that has a tendency to diminish public confidence in the legal system or in the legal profession, his duty to clients or to the public should never be subordinate merely because the full discharge of his obligation may be misunderstood or may tend to subject him or the legal profession to criticism . . ." (EC 9–2)

In *Sapienza v. Hayashi* (1976), 57 Haw. 289, 554 P.2d 1131, cited in footnote 5 of the lead Opinion, this Canon was discussed as follows:

> "Canon 9 was not intended to serve as a sweeping basis for the disqualification of attorneys who are otherwise free of potential conflicts of interest. Neither was it designed to provide a convenient refuge for the timid practitioner or to serve as an excuse for the public servant to avoid the performance of an unpleasant duty." (citations omitted).

I would hold under our statute and case law that a prosecutor, at a minimum, must represent to the trial court that he has a conflict before the court is authorized to replace him in a particular case or cases. This was not the situation here.

With regard to the Order itself, its overbreadth, vagueness and numerous ambiguities are apparent even on cursory examination. The first part of the Order allows the special prosecutor to act upon "certain allegations . . . concerning possible criminal conduct by public officials". First, there is no allegation that James A. Kizer, the Prosecuting Attorney, had any conflict whatsoever which would serve as a basis for disqualification in the prosecution and investigation of these "allegations". Second, since the Order does not define "public offi-

cials," it purports to grant the special prosecutor authority to investigate and prosecute any "public officials", whether they be connected with the executive, legislative or judicial branches of the Federal, State or local government.

The second portion of the Order permits the special prosecutor to investigate and prosecute allegations "concerning the possible commission of crimes which have not been properly investigated or prosecuted". First, the language fails to denote whether the special prosecutor's authority is limited to only those particular crimes which occurred prior to his appointment. Second, it is not clear whether the failure of the regular prosecutor to properly investigate or prosecute one crime would open the door for the special prosecutor to prosecute all crimes of that particular class. For example, if a theft case were improperly prosecuted by the regular prosecutor, would the special prosecutor then be authorized to prosecute all crimes involving thefts, including burglaries and robberies? This appears to be the interpretation given the language in the lead Opinion.[1] Finally, does the language authorize the special prosecutor to prosecute crimes committed after his appointment? This interpretation would give the special prosecutor dual jurisdiction with the regular prosecutor who remained in office.

In the performance of their duties prosecutors decline prosecution in a variety of cases. In most instances these declinations are based on lack of evidence. Additionally, limited manpower and resources often force prosecutors to concentrate their efforts in those areas which, in the public interest, they deem most critical while giving certain types of crimes much less priority and, consequently, less attention. This legitimate exercise of discretion by a prosecutor, on occasion, is met with disapproval by law enforcement agencies, his own deputies and others. At times, criticisms of his judgment may be justified. Unfortunately the language used by the Majority could be

---

1. The investigation of Defendant King's alleged crime was not reported to Prosecutor Kizer. Thus, he was given no opportunity to investigate or prosecute it.

interpreted as opening the door to the replacement of a prosecutor upon the complaint and testimony of a dissatisfied police officer, former deputy[2] or third parties, including victims of crimes, members of their families, local volunteer crime commissions, etc.

In *State ex rel. Spencer v. Criminal Court of Marion County* (1938), 214 Ind. 551, 15 N.E.2d 1020, 1022, our Supreme Court said:
". . . [t]he prosecuting attorney is a constitutional judicial officer, elected by the people, and removable only by impeachment. In him is vested discretionary judicial power to investigate and determine who shall be prosecuted and who shall not be prosecuted. If he fails to exercise his official discretion, honestly and impartially, the remedy is by impeachment. Judges and Courts may not substitute their discretion for that of the prosecuting attorney. Inquisitorial powers are vested in the office of the prosecutor and in grand juries, and not in judges and courts . . ."
15 N.E.2d at 1022.

Further, the Majority Opinion acknowledges that "[n]either lack of intellect, learning, nor even moral courage, in prosecuting attorney, judge, or other elected officers, constitutes a disqualification to act officially." *State ex rel. Williams v. Ellis* (1915), 184 Ind. 307, 112 N.E. 98, 103.

The last portion of the Order authorized the special prosecutor to investigate public allegations that the prosecuting attorney has "been influenced in the conduct of his office by political considerations" and authorized such special prosecutor to investigate the allegations and "conduct the prosecution of any criminal charges which may arise therefrom." What constitutes "political considerations" is not specified and is a term so vague that I need not burden this opinion with numerous possible interpretations. Suffice it to say that when a prosecutor is an interested party or otherwise clearly incapacitated the trial court may appoint a special prosecutor "But this may not be done upon mere suspicion or rumor." *State ex re. Spencer, supra.*

In conclusion, Mr. Hanna was a de facto public officer and King lacked standing to collaterally attack his indictment as being initiated and signed by Hanna. However, the procedure utilized in the appointment and the Order appointing the special prosecutor stand as a model of when and how a special prosecutor should *not* be appointed.

---

**2.** At the hearing on the motion to dismiss, Prosecutor Kizer testified that the drug cases which the Majority notes came "perilously close (7 to 10 days) to lapsing under Crim.R. 4" were actually assigned to and the responsibility of his then Chief Deputy John C. Dibble whose testimony formed the basis of the trial court's determination that drug cases were improperly prosecuted by Kizer and, therefore, within the special prosecutor's jurisdiction. Dibble had been fired by Kizer and thereafter had publicly advocated the appointment of the special prosecutor and a special grand jury. Dibble's testimony concerning City of Lafayette Police policies with respect to drug investigations was not relevant. The City administration, not the county prosecutor, fixes the policies of its police department. Because of the ambiguity of the Order and the conflicting testimony at the hearing, the trial court's conclusion that "drug cases" were within the purview of the Order was based on mere speculation. Kizer apparently acquiesced in the special prosecutor's appointment so he would not appear to be interfering with an investigation of alleged improprieties in the performance of his duties. The allegations of improper conduct were made by Dibble. There was no direct evidence by Kizer or the appointing Judges specifying the nature of the crimes included in the Order.